CITY OF SANTA CLARA,
CALIFORNIA, Appellant,

v.

Cecil ANDRUS, Individually and as Secretary of the Interior, and R. Keith Higginson, Individually and as Commissioner of the Bureau of Reclamation, United States Department of Interior, Appellees.

Cecil ANDRUS, Individually and as Secretary of the Interior, and R. Keith Higginson, Individually and as Commissioner of the Bureau of Reclamation, United States Department of Interior, Appellants,

v.

CITY OF SANTA CLARA,
CALIFORNIA, Appellee.

PACIFIC GAS & ELECTRIC
COMPANY, Appellant,

v.

CITY OF SANTA CLARA,
CALIFORNIA, Appellee.

Nos. 77–1110, 77–1270, 77–1189
and 76–3670.

United States Court of Appeals,
Ninth Circuit.

Feb. 1, 1978.

As Amended on Denial of Rehearing and
Rehearing En Banc April 4, 1978.

Terry J. Houlihan (argued), San Francisco, Cal., for appellant, cross appellee.

Fred Palmer (argued), Washington, D. C., C. Max Vassanelli (argued), of Dept. of Justice, Washington, D. C., for appellees, cross appellants.

Before DUNIWAY and CARTER, Circuit Judges, and BURNS,* District Judge.

DUNIWAY, Circuit Judge:

This case concerns sales by the Secretary of the Interior of low-cost hydroelectric power generated by the Central Valley Project in California. The city of Santa Clara filed this action for declaratory and injunctive relief, challenging the Secretary's decisions to withdraw power from the City and to deny it an allocation of "firm" (non-withdrawable) power. The Pacific Gas and Electric Company (PG&E) was allowed to intervene and counterclaim for certain funds being held in an escrow. All parties moved for summary judgment. The district court granted the Secretary's motion as to Santa Clara's National Environmental Policy Act (NEPA) claim, denied the other motions, and "remanded" the case to the Secretary for the promulgation of rules and procedures concerning the marketing power generated by the Central Valley Project. The court's judgment also dismissed the action without prejudice. All parties appeal. We affirm in part, reverse in part, and remand in part.

* The Honorable James M. Burns, United States District Judge for the District of Oregon, sitting by designation.

## FACTS

The Central Valley Project (CVP) is a multipurpose federal reclamation project consisting of numerous dams, hydroelectric power plants, transmission lines, and irrigation canals, located in the Central Valley of California and its surrounding mountains.[1] While production of hydroelectric power is not the primary purpose of the CVP, a substantial amount of electricity is generated by the project and ultimately sold to a large and varied group of users in Northern and Central California.

The Secretary of the Interior, through the Bureau of Reclamation, sells the power generated by the CVP at a price substantially lower than that charged by private utilities such as PG&E.[2] Consequently, CVP power does not lack for willing purchasers. Section 9(c) of the Reclamation Project Act of 1939, 43 U.S.C. § 485h(c), provides that in sales or leases of electric power or power privileges, made by the Secretary, "preference shall be given to municipalities and other public corporations or agencies" and REA cooperatives.

Santa Clara first sought an allocation of CVP power on June 1, 1960, although it was then under contract to buy power from PG&E and so could not then take power from CVP. In 1962, the Secretary informed Santa Clara and others that 250,000 kilowatts of firm power would become available to preference customers upon completion of the Trinity River Division of the CVP, and invited applications for this new power. Santa Clara renewed its request for power on February 19, 1962, acknowledging that it would be unable to receive the power until the expiration, on August 27, 1967, of its requirements contract with PG&E. The Secretary responded that while he would not commit himself to such a future allocation, Santa Clara's application would be kept on file for consideration nearer the time when the City could actually begin purchasing federal power.

When the Trinity River Division of the CVP came on line in early 1963, the additional power which became available was allocated to other preference customers which were able to take it immediately.

Between 1963 and 1964, CVP's generating capacity increased further. Notice of the availability of additional power was sent to all preference entities, Santa Clara among them, asking for estimates of present load requirements and future load growth. The additional power was ultimately allocated to then existing preference customers and Santa Clara was again excluded because of its inability to take power immediately.

Concerned that all CVP power was fast becoming spoken for, Santa Clara telegraphed the Secretary in July, 1964, asserting that its contract with PG&E was not binding and requesting an immediate allocation of power, on a withdrawable basis if necessary. The Secretary replied that, while all anticipated power was committed to meet the growth needs of other preference customers, 75,000 kilowatts could be offered to the City on a withdrawable basis.

On November 30, 1965, Santa Clara finally contracted with the Secretary for the supply of 75,000 kilowatts of CVP power on a withdrawable basis. At the same time, Santa Clara entered into an agreement with PG&E which required the utility to supply the City with sufficient electricity to meet any power requirements not satisfied by the CVP allotment.

Santa Clara's original allotment of 75,000 kilowatts was revised upward several times after 1965 by contract amendment. The City's allotment peaked at 120,000 kilowatts in 1970, after which the Secretary, by unilateral contract amendment, began withdrawing power from Santa Clara to meet the needs of its older preference customers. Between 1971 and 1974, the City's allotment was cut back from 120,000 kilowatts to 71,-450 kilowatts. This amount is likely to

---

1. The CVP is described in detail in *Ivanhoe Irrigation District v. McCracken*, 1958, 357 U.S. 275, 280–83, 78 S.Ct. 1174, 2 L.Ed.2d 1313.

2. In 1976, the price of CVP power ($.005 per kilowatt hour) was roughly one-fourth of that charged by PG&E ($.019 per kilowatt hour).

dwindle still further if the Secretary has his way.

During the period when Santa Clara was receiving all of its power requirements from the CVP, it continued to ask the Secretary for a nonwithdrawable allocation. However, as additional power became available, the Secretary decided to hold it for preference customers already receiving nonwithdrawable allotments, rather than to offer it to customers with withdrawable allocations such as Santa Clara. On February 4, 1972, the Secretary finally informed Santa Clara by letter that he would not allocate nonwithdrawable power to the City, then or at any time.

In 1971, when the government began withdrawing power from Santa Clara, PG&E began monthly billings for that portion of the City's requirements not met by the CVP allocation and supplied by PG&E. Contending that the withdrawals were unlawful and consequently ineffective, Santa Clara insisted that its power needs were still being fully supplied by the Secretary. The City began paying the moneys demanded by PG&E into an escrow account and has done so ever since.

## PROCEEDINGS IN THE TRIAL COURT

On July 25, 1975, Santa Clara filed this action against the Secretary and the Commissioner of the Bureau of Reclamation (the federal defendants), seeking declaratory and injunctive relief. In its complaint the City challenged the withdrawal of CVP power and the Secretary's refusal to supply it with a nonwithdrawable allocation. PG&E intervened as a party-defendant, counterclaiming for declaratory relief with respect to the funds held in escrow. All parties moved for summary judgment.

On July 23, 1976, the district court issued its opinion, *City of Santa Clara v. Kleppe*, N.D.Cal., 1976, 418 F.Supp. 1243, holding as follows: (1) Santa Clara's action is not barred by sovereign immunity; (2) the Sec-

retary's contractual relationship with PG&E does not violate the reclamation laws; (3) the Secretary's decisions allocating CVP power are reviewable; (4) Congress has not approved the existing allocation scheme; (5) the Secretary violated the Administrative Procedure Act (APA) by failing to promulgate and publish rules of procedure governing the allocation of CVP power; (6) the Secretary's actions denied Santa Clara due process; and (7) the National Environmental Policy Act (NEPA) did not require the Secretary to file an environmental impact statement before withdrawing power from the City. The district court's opinion contained no ruling on defendants' claim that Santa Clara's action was untimely and barred by laches.

Although the trial court held that the Secretary's marketing decisions were reviewable, it did not pass on the lawfulness of the existing allocation scheme. Instead, it remanded the action to the Secretary with instructions to remedy the due process and APA violations. With regard to PG&E's counterclaim, the court ruled that the utility's right to be reimbursed by Santa Clara would depend upon the allocation scheme adopted by the Secretary on remand. The court therefore ordered that the disputed funds remain temporarily in escrow.[3] It also dismissed the action without prejudice.

### I.

### JURISDICTION ON APPEAL

Although the dismissal of the action "in its entirety" is "without prejudice," we find that the judgment based upon it is a final judgment, appealable under 28 U.S.C. § 1291. The language "without prejudice" avoids the "on the merits" effect of Rule 41(b), F.R.Civ.P., and permits the filing of a new action by any party dissatisfied with the Secretary's action on remand. It is still true, however, that the judgment disposes

---

**3.** The court later modified this decision, ordering that one quarter of the funds in escrow be disbursed to PG&E to enable the utility to recoup the costs incurred in purchasing the pow-

er ultimately resold to Santa Clara. *See City of Santa Clara v. Kleppe*, N.D.Cal., 1976, 428 F.Supp. 315.

of the action. Moreover, the remand is, in substance, a mandatory injunction requiring certain action by the Secretary, and so appealable under 28 U.S.C. § 1292(a)(1) assuming, but not deciding, that it is not a final judgment under § 1291.

We have jurisdiction. *See Gueory v. Hampton*, 1974, 167 U.S.App.D.C. 1, 4, 510 F.2d 1222, 1225; *Hines v. D'Artois*, 5 Cir., 1976, 531 F.2d 726, 730.

## II.

### LACHES AND THE STATUTE OF LIMITATIONS

The federal defendants argue that this action is barred by either the six-year statute of limitations, 28 U.S.C. § 2401(a), or the doctrine of laches. These arguments are based on the assumption that Santa Clara's claim for relief arose no later than 1965 when the City entered into a contract with the Secretary for the supply of withdrawable CVP power.

Long after 1965, however, the Secretary, through the regional director of the Bureau of Reclamation, continued to assure Santa Clara that its applications for nonwithdrawable power would receive due consideration in the future. It was not until 1972 that the Secretary informed the City by letter that all firm CVP power was committed to meet the growth needs of other preference customers. Until that date, the City could reasonably have believed that it could, in future, secure an allocation of firm power. We therefore conclude that Santa Clara's claim for relief did not arise until 1972, when the Secretary finally told the City, in unequivocal terms, that its applications for nonwithdrawable power would not be considered, then or later.

## III.

### REVIEWABILITY OF THE SECRETARY'S DECISIONS

PG&E and the federal defendants assert that the Secretary's decisions concerning the allocation of CVP power are immune from judicial review. Specifically, they contend that the Secretary's marketing decisions are actions "committed to agency discretion by law" within the meaning of the APA, 5 U.S.C. § 701(a)(2).

Judicial reviewability of administrative action is the rule and nonreviewability a narrow exception, the existence of which must be clearly demonstrated. *Arizona Power Pooling Ass'n v. Morton*, 9 Cir., 1975, 527 F.2d 721, 727, *cert. denied*, 1976, 425 U.S. 911, 96 S.Ct. 1506, 47 L.Ed.2d 761. The Supreme Court has stated that review is precluded only "in those rare instances where 'statutes are drawn in such broad terms that in a given case there is no law to apply.'" *Citizens To Preserve Overton Park v. Volpe*, 1971, 401 U.S. 402, 410, 91 S.Ct. 814, 821, 28 L.Ed.2d 136. *See also, Ness Investment Corp. v. United States Department of Agriculture, Forest Service*, 9 Cir., 1975, 512 F.2d 706, 713. If, however, no law fetters the exercise of administrative discretion, the courts have no standard against which to measure the lawfulness of agency action. In such cases no issues susceptible of judicial resolution are presented and the courts are accordingly without jurisdiction. *Arizona Power Authority v. Morton*, 9 Cir., 1977, 549 F.2d 1231, 1239, *cert. denied*, 1977, 434 U.S. 835, 98 S.Ct. 124, 54 L.Ed.2d 97.

In considering whether administrative action is "committed to agency discretion by law" within the meaning of the APA, the test "is not whether a statute viewed in the abstract lacks law to be applied, but rather, whether '*in a given case*' there is no law to be applied." *Strickland v. Morton*, 9 Cir., 1975, 519 F.2d 467, 470 (emphasis in original). Thus the existence of some law generally applicable to the subject matter in question will not necessarily remove administrative action from the "committed to agency discretion" rubric. There is "law to apply," only if a specific statute limits the agency's discretion to act in the manner which is challenged.

A. *The Refusal to Contract with Santa Clara for Firm Power.*

Santa Clara says that two statutes provide "law to apply" in evaluating the Secretary's decisions concerning the sale of power generated by the CVP to Santa Clara. The first is the Central Valley Project Authorization Act, 50 Stat. 850, which incorporates generally the provisions of the reclamation laws. Section 9(c) of the Reclamation Project Act of 1939, 43 U.S.C. § 485h(c), defines a class of customers which are to receive a preference in the sale of power generated by federal reclamation projects. The class of preference customers includes "municipalities and other public corporations or agencies."

Our recent decision in the case of *Arizona Power Authority v. Morton, supra,* forecloses Santa Clara's argument that the Secretary, by providing other public entities with nonwithdrawable power allocations while denying such a "firm" allocation to Santa Clara, thereby violated the terms of the preference clause. In that case a group of preference customers for power in Arizona challenged the Secretary's decision to allocate most of the power produced by Colorado River Storage Project (CRSP) generating facilities to preference customers located in the "upper basin" states of Wyoming, Colorado, Utah and New Mexico. We held that the Secretary was obliged to market power generated by CRSP facilities to preference customers in accord with the dictates of the Reclamation Project Act of 1939, 43 U.S.C. § 485h(c), but concluded that the preference clause permitted the Secretary to discriminate against some preference entities in favor of others. "[I]t would appear in light of his broad discretion that the Secretary may adopt whatever geographic preference he desires and that we have no jurisdiction to review his action." 549 F.2d at 1241.

■ The preference clause requires only that public entities be given a preference over private entities in the marketing of power generated by federal reclamation projects. *Arizona Power Pooling Ass'n v. Morton, supra,* 527 F.2d at 726–28. It does not require that all preference customers be treated equally or that all potential preference customers receive an allotment. *Arizona Power Authority v. Morton, supra,* 549 F.2d at 1241, 1252. Where, as here, one preference entity challenges the Secretary's decision to discriminate against it in favor of other preference entities, the reclamation laws provide no law to apply to the dispute. If he so chooses, the Secretary can market *all* available CVP power to a single public entity without running afoul of the preference clause.

In *Arizona v. California,* 1963, 373 U.S. 546, 83 S.Ct. 1468, 10 L.Ed.2d 542, the Court considered the scope of the Secretary's authority to allocate the waters of the Colorado River pursuant to the Boulder Canyon Project Act. The Court stated:

> The general authority to make contracts normally includes the power to choose with whom and upon what terms the contracts will be made. When Congress in an Act grants authority to contract, that authority is no less than the general authority, unless Congress has placed some limit on it. . . . [W]e are persuaded that had Congress intended . . to fetter the Secretary's discretion, it would have done so in clear and unequivocal terms . . . 373 U.S. at 580, 83 S.Ct. at 1487.

Nothing in the legislative history of the Reclamation Project Act of 1939 suggests that Congress intended to limit the Secretary's discretion to interpret the preference clause in making decisions as to whether or how or on what terms he will sell power to particular preference customers as compared to other preference customers.

■ Santa Clara also relies on Section 5 of the Flood Control Act of 1944, 16 U.S.C. § 825s, as providing an alternative standard against which the Secretary's marketing decisions can be measured. In pertinent part, section 5 provides that power is to be disposed of "in such manner as to encourage the most widespread use thereof consistent with sound business principles." By its terms this directive governs only the sale of power generated by flood control

projects operated by the Department of the Army. The standard's applicability to the sale of power generated by the CVP, which is operated by the Bureau of Reclamation, is therefore questionable. Santa Clara maintains that the federal defendants themselves, as a matter of departmental policy, have long regarded the provisions of the Flood Control Act as applicable to the marketing of CVP power. We find it unnecessary to decide whether the Flood Control Act does apply to the sale of power generated by the CVP because the standard that it contains, even if applicable, is too vague and general to provide law to apply.

The Flood Control Act's directive to market power in such a way as to "encourage the most widespread use thereof" could be interpreted in many different ways, such as to require that power be sold to as many different preference entities as possible, thereby fostering the most widespread geographic use of the power, or to mandate sale of the power to those preference entities whose customers present the most diversified mix of agricultural, industrial or residential users, or to require sale of federal power to those preference entities which serve the largest number of ultimate consumers.

Clearly, the "most widespread use" standard is susceptible of widely divergent interpretations. As we said of another law in *Strickland v. Morton, supra,* "[t]he provisions of this statute breathe discretion at every pore." 519 F.2d at 469. The statute permits the exercise of the widest administrative discretion by the Secretary. It does not supply "law to apply." *See Arizona Power Authority v. Morton, supra,* 549 F.2d at 1252.

In *Panama Canal Co. v. Grace Lines, Inc.,* 1958, 356 U.S. 309, 78 S.Ct. 752, 2 L.Ed.2d 788, the Court was asked to review the federally chartered Canal Company's decision to require ships passing through the Canal to pay particular tolls. While the applicable statute set out in some detail the criteria to be considered by the Company in prescribing tolls, the Court concluded that the Company's discretion in interpreting the statute was so broad as to bring it within 5 U.S.C. § 701(a)(2) (formerly § 1009) and thus to preclude judicial reviews:

> Where the matter is peradventure clear, where the agency is clearly derelict in failing to act, where the inaction or action turns on a mistake of law, then judicial relief is often available . . . But where the duty to act turns on matters of doubtful or highly debatable inference from loose statutory terms, the very construction of the statute is a distinct and profound exercise of discretion. 356 U.S. at 318, 78 S.Ct. at 757.

We conclude that the Secretary's refusal to allocate nonwithdrawable power to Santa Clara is unreviewable because there is "no law to apply." The preference clause contained in the Reclamation Project Act of 1939 does not prevent the Secretary from discriminating against some preference entities to the benefit of others. The Flood Control Act of 1944, while arguably applicable to the sale of power generated by the CVP, is so imprecise that its interpretation requires a "profound exercise of discretion" of the sort described in the *Panama Canal* case. The trial court's finding that the Secretary's marketing decisions as to the terms on which he will market power to preference customers are reviewable is in error. Decisions concerning the proper allocation of CVP power among preference entities are "action committed to agency discretion by law" within the meaning of the APA and as such are unreviewable.[4]

---

4. Although the argument was not raised in the trial court, Santa Clara now argues on appeal that inclusion of the Folsom Dam in the CVP network mandates application of a power marketing standard similar to that contained in the Flood Control Act. Section 4 of the American River Act of 1949, 63 Stat. 852, directs the Secretary of the Interior to operate Folsom Dam "in such manner as will effectuate the fullest and most economic utilization of the land and water resources of the Central Valley project of California for the widest public benefit." This marketing standard is as imprecise as that contained in the Flood Control Act and we reject the argument that it provides law to apply to the instant dispute.

## B. *The Sale of Power to PG&E.*

■■ Santa Clara challenges the Secretary's decision to sell massive quantities of CVP power to PG&E, a privately owned utility. While we have concluded that the preference clause contained in section 9(c) of the Reclamation Project Act of 1939 does not provide law to apply to the Secretary's decision to allocate CVP power among preference customers in one fashion rather than another, the statute clearly does provide a standard against which the propriety of sales to non-preference entities such as PG&E can be measured. *Arizona Power Pooling Ass'n v. Morton, supra.*[5]

PG&E and the federal defendants do not argue otherwise. They concede the applicability of the preference clause but contend that the present marketing scheme does not violate the clause because power is not sold outright to PG&E but is rather "banked" temporarily with the utility pursuant to government contract. The contract provides that all CVP power which is sold to PG&E is subject to the Secretary's right to repurchase at a later date, at the original price plus a "handling charge," plus the difference in cost to PG&E of producing the power sold to the Secretary over PG&E's similar cost at the time it bought.

The Secretary maintains that this arrangement is designed to enable him to supply the growth needs of selected preference customers until 1980. By "banking" power with PG&E during periods when the total output of the CVP exceeds the demands of these selected customers, the Secretary creates an "account" which he can draw on to satisfy their requirements when demand outstrips supply. It is more accurate to state that the contract requires that an account be kept of all power sold to PG&E and that the Secretary may thereafter purchase power, up to that amount, from PG&E. PG&E sells the power that it buys from the Secretary to its customers at its price. To describe this arrangement as "banking" is to use an inaccurate and somewhat misleading figure of speech.

The relationship between the Secretary and PG&E and the Secretary's preference customers such as Santa Clara is further complicated by two facts. The first is that CVP power is fed into PG&E's distribution system and is transmitted by PG&E over its lines to preference customers and to PG&E's own customers. At the same time, power produced by PG&E is also fed into the same distribution system. Once that happens, it is physically impossible, or at least not practicable, to identify any particular unit of power as CVP power or as PG&E power. Thus, in theory, PG&E receives CVP power from CVP and transmits it (or "wheels" it) to Santa Clara over PG&E's lines. In fact, the transmitted power cannot be and is not so identified. The problem is solved by bookkeeping. Track is kept of the amount of CVP power that enters the PG&E system. The Secretary tells PG&E how much of it is for each preference customer. PG&E supplies that amount of power to each. The Secretary then bills each preference customer for that power at the Secretary's price. CVP power received by PG&E and not treated as transmitted to preference customers of the Secretary is treated as sold by the Secretary to PG&E and PG&E pays the Secretary for it. This is the power that is said to be

---

5. As we said in *East Oakland-Fruitvale Planning Council v. Rumsfeld,* 9 Cir., 1972, 471 F.2d 524:

> Agency action is made unreviewable by 5 U.S.C. § 701(a)(2) only "to the extent" that it is committed to agency discretion. . . .
> An "all or nothing" approach to reviewability would, in specific cases, either be unfair to persons aggrieved by agency action, or impose an unwise burden upon the agency or the courts. Accordingly, separable issues appropriate for judicial determination are to be reviewed, though other aspects of the agency

> action may be committed to the agency's expertise and discretion.
> If a statute or regulation establishes a rule governing the conduct of the agency with respect to an aspect of the agency action, a court may determine whether the agency has complied with that rule, although the court still may not review other aspects of the agency action as to which there are no reasonably fixed rules to apply. The presence of a judicially enforceable rule both justifies judicial review, and limits its scope.
> 471 F.2d at 533–34.

"banked" under the PG&E contract with the Secretary.

The second fact is that there is now being fed into the PG&E system more government produced power than is being produced by CVP power plants. This is because of the creation of the Northwest intertie, whereby substantial amounts of power are being transmitted to the CVP area from the Northwest. The PG&E contract with the Secretary relates to that power as well as to CVP power. It is suggested that the Northwest power never would have been available to preference customers in the CVP area without the cooperation of PG&E embodied in the contract with the Secretary. We assume that this is true, but that fact cannot diminish the Secretary's legal obligation to sell to preference customers. Neither the Secretary nor PG&E argues that the full "Project Dependable Capacity" as defined in the contract, paragraphs 9(a) and (i) and 11, is not subject to the preference clause. Their only argument is that the "banking" provisions of the contract satisfy the requirements of the preference clause.

The trial court concluded that the "banking" of CVP power with PG&E was not violative of the preference clause. We conclude that the present marketing scheme involves the sale of power to PG&E and that the terms of the preference provisions are not satisfied by the government's repurchase right.

The preference clause states a clear legislative intent and requirement that the Secretary shall favor public entities in the sale of power generated by federal reclamation projects. As we noted recently in *Arizona Power Pooling Ass'n v. Morton, supra,* "[t]he text of the preference provision is couched in mandatory terms, stating that 'preference *shall* be given' (emphasis added) to certain public entities in governmental sales or leases of electric power or power privileges." 527 F.2d at 727. The Secretary is thus given a very specific directive to market federal power to preference customers if any are ready and willing to purchase it. It is only if the available supply exceeds the demands of interested preference customers that the Secretary may offer federal power to private entities. 41 Op.A.G. 236, 1955, *Disposition of Surplus Power Generated At Clark Hill Reservoir Project.*[6]

In this case the Secretary has marketed CVP power to PG&E, a non-preference entity, during times when a preference customer was having its allotment gradually reduced, over its objection. It is claimed that PG&E's allotment was more than adequate to satisfy Santa Clara's full requirements.[7] Nevertheless, the Secretary has,

6. In advising the Secretary as to the propriety of his proposed scheme for allocating power generated by the Clark Hill Reservoir Project, Attorney General Brownell was called upon to interpret the Flood Control Act of 1944, which contains a preference clause almost identical to that contained in the Reclamation Project Act of 1939. The Attorney General construed the preference provision to require that "when the Secretary of the Interior has before him two competing offers to purchase power, one by a preference customer, and the former does not have at the time the physical means to take and distribute the power, he must contract with the preference customer on condition that such customer will, within a reasonable time to be fixed by the Secretary, obtain the means for taking and delivering the power." *Disposition of Surplus Power Generated At Clark Hill Reservoir Project, supra,* 41 Op.A.G. at 243–44. Thus, in Attorney General Brownell's estimation, even the present inability of a preference customer to take federal power is insufficient

to justify a decision by the Secretary to permanently commit the power to a non-preference customer. Here, of course, Santa Clara is able to take its full power requirements from the CVP and has done so in the past.

7. The following is a comparison of the CVP power sold to Santa Clara as compared to the amount sold to PG&E [in kilowatts]:

| | SANTA CLARA | PG&E |
|---|---|---|
| 1965 | 71,490 | 282,183 |
| 1966 | 78,863 | 198,063 |
| 1967 | 89,367 | 81,377 |
| 1968 | 92,031 | 79,713 |
| 1969 | 106,128 | 55,944 |
| 1970 | 116,471 | 26,406 |
| 1971 | 112,696 | 278,724 |
| 1972 | 89,200 | 382,000 |
| 1973 | 86,550 | 382,000 |
| 1974 | 73,300 | 387,786 |
| 1975 | 73,800 | 337,000 |

since 1971, progressively reduced Santa Clara's withdrawable allocation.

In defense of the Secretary's arrangement with PG&E, he maintains that he is storing up power with the utility for the future benefit of selected preference customers. In the meantime, however, to the extent that Santa Clara could have purchased the power, a private utility is profiting from the low cost of federal power at the expense of a preference entity. This result, we think, does violence to the plain meaning and intent of the preference provision.

While the stated goal of the banking arrangement is consonant with the preference clause, inasmuch as all CVP power is ultimately committed to meet the needs of public entities, the propriety of the goal cannot save the scheme if its interim effects are violative of the statute. That may be the case here. Congress intended public entities, whenever possible, to benefit from the sale of low cost federal power. An arrangement which enables a nonpreference entity to reap a benefit which Congress sought to bestow upon public entities, even temporarily, flies in the face of that intent.

It is no answer for the Secretary to say that he is merely "banking" power with the utility, rather than selling it outright. A sale is no less a sale because the buyer is obliged, upon the seller's demand, to resell an equivalent amount to the seller. The plain fact is that the power which is conveyed to PG&E does not sit idly in storage, awaiting withdrawal by the government. Instead it is resold by PG&E to its own customers at a substantial mark up. This is a sale, regardless of the verbiage employed to characterize the arrangement.

In *United States v. City and County of San Francisco*, 1940, 310 U.S. 16, 60 S.Ct. 749, 84 L.Ed. 1050 the Court considered a challenge to the sale by San Francisco to PG&E of power generated from the Hetch Hetchy project in Yosemite National Park.

Section 6 of the Raker Act, 38 Stat. 242, which governed disposition of the power by San Francisco, prohibited the City "from ever selling or letting to any corporation or individual, except a municipality or municipal water district or irrigation district, the right to sell or sublet the water or the electric energy sold or given to it" by the United States. San Francisco argued that although it conveyed power to PG&E, section 6 was not violated because the power was "consigned" and not sold, to the utility, which acted as "agent" for the City in transmitting and selling the power. The court concluded that San Francisco's contractual relationship with PG&E contravened the legislative intent behind the Raker Act regardless of the words used to describe it:

> Terminology of consignment of power, rather than of transfer by sale, and verbal description of the power Company as the City's agent or consignee, are not sufficient to take the actions of the parties under the contract out of § 6. Congress, in effect trustee of public lands for all the people, has by this Act sought to protect and control the disposition of a section of the public domain. The City has in fact followed a course of conduct which Congress, by § 6, has forbidden. Mere words and ingenuity of contractual expression, whatever their effect between the parties, cannot by description make permissible a course of conduct forbidden by law. When we look behind the word description of the arrangement between the City and the power Company to what was actually done, we see that the City has—contrary to the terms of § 6—abdicated its control over the sale and ultimate distribution of Hetch-Hetchy power. 310 U.S. at 28, 60 S.Ct. at 756.

While the preference clause directs the Secretary to extend a preference to public entities in the sale of power generated by federal reclamation projects, that mandate

---

The sales to PG&E are in such high quantity that this nonpreference customer has become the Bureau's largest customer.

(Opening Brief of Santa Clara, pp. 44–45). These figures are not disputed by the Secretary or by PG&E.

is qualified slightly by the following proviso:

No contract relating to . . . electric power or power privileges shall be made unless, in the judgment of the Secretary, it will not impair the efficiency of the project for irrigation purposes. 43 U.S.C. § 485h(c).

Thus the Secretary is prohibited from selling CVP power to a preference entity if, in his estimation, to do so would have the effect of cutting back on the power necessary to operate the project's pumping facilities.

Before the trial court, the Secretary sought to justify the sale of power to PG&E on the sole ground that the government's right to repurchase power "banked" with the utility satisfied the preference clause. The issue of the CVP's efficiency for irrigation purposes, and the likely impact of the present marketing scheme, or of Santa Clara's attack upon it, on that efficiency, were not addressed by any of the parties in their moving papers upon which the trial court rendered its decision.

In light of the paucity of information adduced on this key issue, we are loathe to hold the sale of power to PG&E at Santa Clara's expense flatly invalid. It is conceivable that the Secretary's decision to favor PG&E over Santa Clara in the marketing of CVP power could be justified as a measure designed to maximize the project's efficiency for its primary purpose, which is irrigation.

PG&E and the Secretary argue that during at least part of the period beginning in 1972, when the Secretary was gradually reducing Santa Clara's allotment, CVP did not have the energy necessary to supply Santa Clara, and Santa Clara was not willing or able to take such intermittent power as was being sold to PG&E. It is also claimed that some of the power sold by the Secretary to PG&E may not have been subject to the preference clause. The trial court did not decide these questions. They

can be considered on remand, as can the issue of CVP's efficiency for irrigation purposes if the Secretary chooses to raise it.

## C. Congressional Approval.

█ The federal defendants argue that Congress ratified the existing power allocation scheme when it appropriated moneys for the construction of an extra high voltage intertie between the Pacific Northwest and Pacific Southwest. To show ratification, the government must sustain the heavy burden of demonstrating congressional knowledge of the precise course of action alleged to have been acquiesced in. *United States v. Beebe,* 1901, 180 U.S. 343, 354, 21 S.Ct. 371, 45 L.Ed. 563; *United States v. Georgia-Pacific Co.,* 9 Cir., 1970, 421 F.2d 92, 102 n. 28.

We fully agree with the district court's determination that the record in this case "does not support a finding of congressional knowledge of the exclusion of post-1964 preference customers from receiving non-withdrawable CVP power sufficient to equate passage of the appropriations bills with ratification of the exclusion." *City of Santa Clara v. Kleppe, supra,* 418 F.Supp. at 1256. Similar efforts to infer congressional approval of specific agency actions from the enactment of general appropriations measures proved unsuccessful in *Arizona Power Pooling Ass'n v. Morton, supra,* 527 F.2d at 725–26. *See also, Associated Electric Cooperative Inc. v. Morton,* 1974, 165 U.S.App.D.C. 344, 351–52, 507 F.2d 1167, 1174–75, *cert. denied,* 1975, 423 U.S. 830, 96 S.Ct. 49, 46 L.Ed.2d 47. We think that those decisions are controlling here.

## IV.

## RULE MAKING AND THE ADMINISTRATIVE PROCEDURE ACT

Santa Clara urges, and the district court found, that the procedures followed by the Secretary in arriving at his marketing decisions failed to comport with certain provi-

sions contained in the APA. While we have concluded that the Secretary's scheme for allocating CVP power among preference customers is substantially unreviewable, the adequacy of the procedures utilized in formulating the marketing scheme is a separable issue. *East Oakland-Fruitvale Planning Council v. Rumsfeld,* 9 Cir., 1972, 471 F.2d 524, 533–35. *See also, Moore-McCormack Lines, Inc. v. United States,* Ct.Cl., 1969, 413 F.2d 568, 581; Saferstein, "Nonreviewability: A Functional Analysis of 'Committed to Agency Discretion,'" 82 Harv.L.Rev. 367, 372 (1968).

■ The rule making section of the APA, 5 U.S.C. § 553, requires federal agencies to notify the public, conduct hearings, and consider the input of interested parties, before promulgating new substantive rules. However, that section expressly exempts from the rule making requirement all matters "relating to . . . public property." 5 U.S.C. § 553(a)(2). Power generated by federal reclamation projects is certainly public property; hence the Secretary, in deciding how to allocate CVP output, is not bound to follow the procedures mandated by 5 U.S.C. § 553. *Associated Electric Cooperative, Inc. v. Morton, supra,* 165 U.S. App.D.C. at 354–55, 507 F.2d at 1177–78. *Northern California Power Agency v. Morton,* D.D.C., 1975, 396 F.Supp. 1187, 1191 n. 6, *aff'd* 1976, 176 U.S.App.D.C. 241, 539 F.2d 243.

Santa Clara nonetheless argues, and the trial court held, that 5 U.S.C. § 552, the "Public Information" section of the APA, requires the Secretary to promulgate rules to be followed in arriving at power marketing decisions. In pertinent part, 5 U.S.C. § 552(a)(1) provides that each agency shall publish in the Federal Register:

(B) statements of the general course and method by which its functions are channeled and determined . . . .

(C) rules of procedure . . .

(D) substantive rules of general applicability adopted as authorized by law, and statements of general policy or interpretation of general applicability formulated and adopted by the agency . . .

As amended in 1966, section 552 also provides that "[e]xcept to the extent that a person has actual and timely notice of the terms thereof, a person may not in any manner be required to resort to, or be adversely affected by, a matter required to be published in the Federal Register and not so published."

On its face, section 552 requires only the publication of existing rules and not the promulgation of new ones. The section requires agencies to make "*available*" procedures by which their functions "are channeled and determined," and the substantive rules and general policies which have been "adopted" or "formulated and adopted." This interpretation is bolstered by the existence of an entirely separate section, § 553, headed "rule making," and by the legislative history of the APA itself. The legislative history suggests that in enacting § 552, Congress was concerned exclusively with the dearth of published descriptions concerning agency structure, function, and procedure.

In 1941, the Senate Judiciary Committee held extensive hearings on the soon to be enacted APA. During those hearings, spokesmen for numerous agencies repeatedly voiced that fear that the publication provisions contained in the proposed law might be construed to require them to develop new rules and regulations. Dean Acheson, Chairman of the Committee appointed by President Roosevelt to make recommendations for improving administrative procedure, addressed these fears in a formal statement to the Senate Judiciary Committee. Of the predecessor provision of section 552, Acheson said:

. . . [I]n order that persons may know what the policies and interpretations of an agency are, we suggest in section 201(2) that all such policies and interpretations, and the procedures whether formal or informal, and the forms of an agency be made available.

There has been some misunderstanding about the scope of this subsection (2). It is not intended to require agencies to make up policies and interpretations of

law, or procedures, out of whole cloth merely for the sake of making them. Rather this section is intended to require agencies to make available to the public those policies and procedures which have become crystallized, which through experience have been formulated and adopted. Hearings before a subcommittee of the Senate Judiciary Committee on S. 674, S. 675 and S. 918, 77th Cong., 1st Sess. 829 (1941)

The House and Senate Reports on the APA likewise suggest that Congress, in enacting § 552, sought only to insure that those administrative rules which had "crystallized" would be made available to the public:

> The public information requirements of section 3 are in many ways the most important, far-reaching, and useful provisions of the bill. For the information and protection of the public wherever located, these provisions require agencies to take the mystery out of administrative procedure by stating it. The section has been drawn upon the theory that administrative operations and procedures are public property which the general public, rather than a few specialists or lobbyists, is entitled to know or to have the ready means of knowing with definiteness and assurance.

Senate Committee on the Judiciary, Administrative Procedure Act, S.Rep.No. 752, 79th Cong., 1st Sess. 198 (1945). *See also* House Committee on the Judiciary, Administrative Procedure Act, H.Rep.No. 1980, 79th Cong., 2d Sess. 255 (1946).

Santa Clara cites *Morton v. Ruiz,* 1974, 415 U.S. 199, 94 S.Ct. 1055, 39 L.Ed.2d 270, for the proposition that § 552 requires not simply the publication of established rules but also the formulation of new ones. In that case the Bureau of Indian Affairs (BIA) refused to provide general assistance benefits to an Indian couple who had left their reservation to settle in a nearby Indian community. In summarily denying the couple's application for benefits, the BIA cited a provision contained in its Indian Affairs Manual, an internal operations brochure, which restricted benefits to Indians remaining on the reservation. The Court held that this restriction was based on an impermissible construction of the act which established the assistance program and on this basis the Court held it invalid.

The Court went on to announce in *dicta* that even if the restriction were consonant with congressional intent, section 552 required publication of the eligibility requirements for receiving benefits. The policy of restricting benefits to on-reservation Indians involved in *Morton v. Ruiz* had clearly "crystallized." Indeed, it was enshrined in an internal operations manual. Because the rule had already been formulated by the BIA and was routinely applied by the agency, section 552 required publication.

 Here, in contrast, it is not alleged that the Secretary has formulated any rules, substantive or procedural, for the allocation of CVP power. That being so, there is apparently nothing to publish. While some may deplore this state of affairs, the rule making section of the APA, § 553, manifests a clear legislative intent to permit *ad hoc* decision making in the distribution of public property. Senate Committee on the Judiciary, Administrative Procedure Act, S.Rep.No. 752, 79th Cong., 1st Sess. 199 (1945).[8] *Duke City Lumber Co. v. Butz,* D.D.C., 1974, 382 F.Supp. 362, 373, *aff'd,* 176 U.S.App.D.C. 218, 539 F.2d 220, *cert. denied,* 1977, 429 U.S. 1039, 97 S.Ct.

---

**8.** With regard to the public property exemption to the rule making requirement, the Senate Report on the APA states:

> The exception of proprietary matters is included because the principal consideration in most such cases relate to mechanics and interpretations or policy, and it is deemed wise to encourage and facilitate the issuance of rules by dispensing with all mandatory procedural requirements. None of these excep-

tions, however, is to be taken as encouraging agencies not to adopt voluntary public rule making procedures where useful to the agency or beneficial to the public. The exceptions merely confer a complete discretion upon agencies to decide what, if any, public rule making procedures they will adopt in a given situation. . . .

S.Rep.No. 752, 79th Cong., 1st Sess., at 199 (1945).

737, 50 L.Ed.2d 751. We cannot read a rule making requirement into § 552, or interpret the section in such a way as to render meaningless the public property exemption contained in § 553.

■ In *Gonzalez v. Freeman,* 1964, 118 U.S.App.D.C. 180, 334 F.2d 570, and *W. G. Cosby Transfer & Storage Corp. v. Froehlke,* 4 Cir., 1973, 480 F.2d 498, 5 U.S.C. § 552 was interpreted to require agencies to promulgate rules and procedures which had not theretofore been "crystallized." The actual holding in each case was that the agency involved could not terminate a business relationship existing between the agency and the plaintiff without affording a due process type hearing. In each case there is language to the effect that § 552 required the agency to formulate and adopt rules describing the grounds upon which the agency would act and the procedures that it would follow. But in neither case did the court do what the trial court did here, order the agency to formulate and adopt such rules. To the extent that these cases can be said to stand for the proposition that § 552 requires an agency to formulate and adopt rules, we decline to follow them. The trial court's decision in this case, insofar as it requires the Secretary to formulate and adopt rules governing his decisions in marketing power to preference customers, is in error.

## V.

## DUE PROCESS

Santa Clara argues that it has a sufficient property interest in CVP power to entitle it to due process protection. The trial court agreed, and further held that the federal defendants had failed to accord Santa Clara that process which was due. The court therefore ordered the federal defendants, *inter alia,* to (1) re-evaluate the present power allocation scheme with an eye toward possible revision; (2) announce the standards used in devising the allocation scheme then proposed; (3) afford all interested parties an opportunity to comment on the proposed marketing plan; (4)

hold a public hearing on the proposed marketing plan; and (5) announce the specific findings relied on in devising the plan ultimately adopted. *City of Santa Clara v. Kleppe, supra,* 418 F.Supp. at 1261–62.

PG&E argues that Santa Clara is not a "person" entitled to due process protection under the Fifth Amendment. PG&E relies primarily on *South Carolina v. Katzenbach,* 1966, 383 U.S. 301, 323–24, 86 S.Ct. 803, 15 L.Ed.2d 769, where the Court held that a state is not a "person" entitled to due process protection, reasoning that a municipality cannot be a "person" if its progenitor, the state, is not. We are by no means convinced that PG&E's argument is correct. *See Township of River Vale v. Town of Orangetown,* 2 Cir., 1968, 403 F.2d 684, 686, holding that "a municipal corporation like any other corporation is a 'person' within the meaning of the [Constitution]." *See also, Aguayo v. Richardson,* 2 Cir., 1973, 473 F.2d 1090, 1100–01, *cert. denied,* 1974, 414 U.S. 1146, 94 S.Ct. 900, 39 L.Ed.2d 101. We need not decide the question. For the purpose of this case, we assume that Santa Clara is a "person."

■ PG&E and the federal defendants assert that Santa Clara has no protectible "property" interest in CVP power. The trial court based its holding that Santa Clara has such an interest on the City's status as a preference customer under the reclamation laws. In so holding, the trial court was speaking of an interest of Santa Clara vis-a-vis other actual and potential preference customers. The court had already held that sales of CVP power to PG&E under the contract between it and the Secretary did not violate the preference clause. Thus the court had no occasion to decide whether Santa Clara had a "property" interest vis-a-vis PG&E.

We first consider "property" interest as against other preference entities. While the test for identifying a property interest sufficient to merit invocation of the Due Process clause "is not clearly defined," *Pence v. Kleppe,* 9 Cir., 1976, 529 F.2d 135, 141, the Supreme Court has stated that:

To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it. *Board of Regents v. Roth,* 1972, 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548.

*See also, Geneva Towers Tenants Organization v. Federated Mortgage Investors,* 9 Cir., 1974, 504 F.2d 483 at 489.

The exact perimeters of the "entitlement" concept are as yet unclear. *See* Note, "Statutory Entitlement and the Concept of Property," 86 Yale L.J.No. 4, p. 695 (1977). After reviewing the Supreme Court's recent decisions concerning statutorily created property interests, the author of the note concluded that "a statute will create an entitlement to a governmental benefit either if the statute sets out conditions under which the benefit *must* be granted or if the statute sets out the *only* conditions under which the benefit may be denied." 86 Yale L.J. at 696 (emphasis in original). Under this test, Santa Clara has no "entitlement" to CVP power, as against other preferred entities. We think that *Roth* itself is dispositive of this phase of the case. There the Court held that an untenured teacher had no property interest in being rehired because his employment contract gave his employer unbridled discretion to refuse to renew after one year. The employer did not have to justify its decision not to renew the contract by showing "sufficient cause." Thus Roth had only an "abstract concern in being rehired," rather than a legitimate claim of entitlement. *Roth v. Board of Regents, supra,* 408 U.S. at 578, 92 S.Ct. 2701.

Having completed a year of teaching, Roth, like Santa Clara, could differentiate himself from others who sought the government benefit in question. However, Roth's desire to be rehired, his eligibility for contract renewal, and his special status as a former employee, were all insufficient to clothe him with a "legitimate claim of entitlement." Because the Board of Regents could refuse to rehire Roth for any reason

whatsoever, Roth's interest did not rise to the level of an entitlement.

Santa Clara's situation vis-a-vis other preferred entities is comparable. While the City enjoys a statutory preference under the reclamation laws, the Secretary remains free to allocate the total power output of the CVP to other preference users. The Secretary need not justify his decision to discriminate against some preference entities in favor of others and, as we hold today, his decision to so discriminate is not judicially reviewable. Given the discretion which the reclamation laws vest in the Secretary in this respect, we cannot accept Santa Clara's contention that it has any "entitlement" to power generated by the CVP as against other preferred entities. The trial court's holding that Santa Clara's status as a preference entity supported a claim of entitlement as against other preferred entities is erroneous. The City has no "property" interest in CVP power as against other preferred entities and consequently no procedural safeguards are constitutionally required in deciding between them.

■ We next consider "property" interest as against nonpreference entities such as PG&E. It is clear that Santa Clara does have such an interest. In essence, our decision in *Arizona Power Pooling Ass'n v. Morton, supra,* so holds. To similar effect is *Pence v. Kleppe, supra.* There we held that Alaska natives, seeking allotments under the Alaska Native Allotment Act, had sufficient property interests to entitle them to due process. 529 F.2d at 140–42.

What process is due? We have held in part III B, *supra,* that it is a violation of the preference clause for the Secretary to sell CVP power to PG&E to the extent that he is refusing to sell it to an eligible preference entity that has offered to buy it and is ready, willing and able to receive it. There is but one justification possible for a refusal to sell to such a preference entity while selling to a non-preference entity: that, in the judgment of the Secretary, to sell to the preference entity will "impair the efficiency of the project for irrigation purposes," 43 U.S.C. § 485h(c).

It is not disputed that Santa Clara is a preferred entity that has asked for the power. The Secretary and PG&E claim that Santa Clara was not willing or able to receive what the Secretary could sell to it, and that during certain times the Secretary did not have power available to sell to Santa Clara. The Secretary may also claim that selling to Santa Clara would or will impair the efficiency of the project for irrigation purposes. All of these claims can be considered and decided by the trial court. We see no need to remand this case to the Secretary for a due process type hearing.

## VI.

### PG&E'S COUNTERCLAIM

In 1971, the Secretary began withdrawing power from Santa Clara, gradually cutting back on the City's 1970 allotment of 120,000 kilowatts. Pursuant to a contract between PG&E and Santa Clara, executed in 1969, PG&E is obligated to supply Santa Clara's power requirements to the extent that they are not met by the Secretary. Taking the position that the Secretary's attempted withdrawals were illegal and therefore ineffective, Santa Clara refused after 1971 to pay PG&E for any of the power purportedly supplied by it. Because, as we have seen, PG&E transmits CVP power over its own lines pursuant to government contract, so that it is not possible to differentiate CVP power from PG&E power except by reference to written records, Santa Clara took the position that the power purportedly furnished by PG&E was actually CVP power coming in over PG&E's transmission lines. Since 1971, the money claimed by PG&E has been paid into an escrow account which as of March 1, 1977, contained nearly $30,000,000.

PG&E and the Secretary both argue that regardless of the result in this case, PG&E is entitled to all of the money in the escrow. As we have seen, the trial court has, as an interim measure, awarded one-fourth of the money in the escrow to PG&E. (note 3, *supra*)

■ If, as we surmise, the government cannot justify the marketing of power to PG&E while denying it to Santa Clara as a measure designed to safeguard the CVP's efficiency for irrigation purposes, then the past sales to PG&E of so much power as Santa Clara sought and was refused exceeded the Secretary's statutory authority under the reclamation laws. These past sales are void if unlawful, for administrative actions taken in violation of statutory authorization or requirement are of no effect. *Utah Power & Light Co. v. United States,* 1917, 243 U.S. 389, 410, 37 S.Ct. 387, 61 L.Ed. 791; *Federal Crop Insurance Corp. v. Merrill,* 1947, 332 U.S. 380, 384, 68 S.Ct. 1, 92 L.Ed. 10; *Federal Maritime Commission v. Anglo-Canadian Shipping Co.,* 9 Cir., 1964, 335 F.2d 255, 258.

■ The trial court decided that PG&E's right to the disputed funds hinges on the lawfulness of the Secretary's decision to sell power to PG&E while refusing to allocate as much power to Santa Clara as that City requested. Consequently, the court concluded, the fate of the escrow account must await action by the district court on remand.

PG&E and the Secretary vigorously attack this ruling. Their position, as stated by counsel for PG&E, is that power cannot be retroactively allocated to Santa Clara because "[a]t all times pertinent to this case all commercially available CVP power was sold to someone. . . . Accordingly, any retroactive reallocation of CVP power would necessarily entail either a whole or partial recission of some or even all of the sales transactions between the United States and its CVP customers from August 1971 to the present." Opening Brief of PG&E at 17. We think, however, that a reallocation of power to Santa Clara, retroactive to 1971 when the withdrawals began, can be accomplished without affecting past sales to other CVP customers. This is so because the Secretary has, over the years, and pursuant to his contract with PG&E, built up a sizeable "bank account" with PG&E. Presumably, that bank account is now available to retroactively satisfy the City's power needs.

678

Should the district court conclude on remand that the marketing of power to PG&E cannot be justified by reference to the reclamation laws, the government's "bank account" can simply be adjusted downward to reflect past sales to Santa Clara of so much power as the City sought unsuccessfully in the years after 1971. Such a readjustment of the bank account need affect neither past sales of power to other CVP users nor prior transactions between PG&E and its customers, aside from Santa Clara.

Without intending to bind the trial court to our suggestions, it seems to us that the consequences would be substantially as follows:

First, PG&E would be entitled to draw from the escrow the full amount (less, of course, what it has already received) that Santa Clara would have paid to the Secretary for the power that it is "receiving" retroactively. PG&E has paid the Secretary for that power, thereby discharging what should have been Santa Clara's duty. In addition, because it is Santa Clara that withheld the money, PG&E should receive interest at a reasonable rate on the moneys paid to it from the dates when those moneys should have been paid. (See 28 U.S.C. § 1961.) The remaining money in the escrow would go to Santa Clara.

Second, the power reallocated to Santa Clara should be treated as drawn from the Secretary's "bank account" with PG&E, thereby diminishing the amount of the power that the Secretary is entitled, under the PG&E contract, to repurchase.

Third, because PG&E will have received for the power sold by it to Santa Clara only the price that Santa Clara would have paid to the Secretary if he had allocated that power to Santa Clara, but that power is being treated as drawn by the Secretary from the "bank account," it would appear that PG&E will have a claim against the Secretary. Presumably, that claim would be for the contract price applicable under the Secretary's contract with PG&E at the times as of which reallocation is made, less the price PG&E will have received from

Santa Clara, plus reasonable interest for late payment. (See 28 U.S.C. § 2411(b) and § 2516.)

However, PG&E has counterclaimed only against Santa Clara. It has not filed any claim for relief against the Secretary. We express no opinion as to whether such a claim against the Secretary can be filed or considered by the trial court, see 28 U.S.C. § 1346(a)(2), *Lowell O. West Lumber Sales v. United States,* 9 Cir., 1959, 270 F.2d 12, 19–20, or in the Court of Claims, see 28 U.S.C. § 1491.

We base our assumptions as to interest upon a further assumption that PG&E is an innocent third party, caught between the conflicting claims of Santa Clara and the position of the Secretary.

These suggestions are in line with the ancient and favorite maxim of equity, that equity regards that as done which ought to be done. It is readily applicable here, because all parties to the contracts that are involved, PG&E, the Secretary, and Santa Clara, are before the court, and because what we suggest does not invalidate or violate either contract. The contract between PG&E and the Secretary expressly provides that the Secretary is to supply all of his preferred customers before selling to PG&E. It also expressly provides for the so-called banking arrangement. The contract between PG&E and Santa Clara requires sale by PG&E and purchase by Santa Clara of only that amount of power that exceeds the amount sold by the Secretary to Santa Clara.

The foregoing suggestions are just that; they are not directions because we recognize that the questions giving rise to them have not been fully considered up to now, and all parties should have an opportunity to present their views about them to the trial court. That court is to arrive at its own decision, taking into account, but not being bound by, our suggestions.

VII.

SOVEREIGN IMMUNITY

On October 21, 1976, Congress enacted Public Law 94–574, amending 5 U.S.C.

§ 702, to remove the defense of sovereign immunity in an action seeking relief other than money damages and stating a claim that an agency or officer or employee thereof acted or failed to act in an official capacity or under color of legal authority. In *Hill v. United States*, 9 Cir., 1978, 571 F.2d 1098 at 1102 (Slip op., page 45 at 49) we held that this amendment is applicable to a pending action. This statute would have the effect of removing the defense of sovereign immunity, if it were otherwise available in this case. However, it is not necessary to rely on that statute here.

■ It has long been established that sovereign immunity poses no bar to a suit against a federal officer who is alleged to have acted unconstitutionally or in excess of his statutory authority. *Larson v. Domestic & Foreign Commerce Corp.*, 1949, 337 U.S. 682, 689, 69 S.Ct. 1457, 93 L.Ed. 1628; *Starbuck v. City and County of San Francisco*, 9 Cir., 1977, 556 F.2d 450, 457 n. 14; *Washington v. Udall*, 9 Cir., 1969, 417 F.2d 1310, 1314.

■ PG&E and the federal defendants concede that Santa Clara's various claims fall squarely within these exceptions to the general rule that an action cannot be maintained against the sovereign, absent consent. However, they cite *Larson v. Domestic & Foreign Commerce Corp., supra,* for the proposition that

> . . . a suit may fail, as one against the sovereign, even if it is claimed that the officer being sued has acted unconstitutionally or beyond his statutory powers, if the relief requested cannot be granted by merely ordering the cessation of the conduct complained of but will require affirmative action by the sovereign or disposition of unquestionably sovereign property.

337 U.S. at 691, n. 11, 69 S.Ct. at 1462. This court has never interpreted *Larson* as an absolute bar to every action against the sovereign in which affirmative relief or the recovery of government property is sought. *Washington v. Udall, supra,* 417 F.2d at 1317–18. We have construed the case more narrowly to mean "not that a suit *must* fail but only that it *may* fail if the relief sought would work an intolerable burden on the government which outweighs any considerations of private harm." *De Lao v. Califano,* 9 Cir., 1977, 560 F.2d 1384 at 1391.

The retroactive power allocation which Santa Clara seeks would not, we think, work an intolerable burden on governmental functioning. As noted above, the relief requested by the City can be granted by simply adjusting the government's bank account with PG&E. Such an adjustment would not affect prior transactions between the government and its other CVP customers. It would merely hasten depletion of the bank account and so would accelerate the date upon which customer demand for CVP power will exceed the available supply. Inasmuch as all of the banked power is ultimately committed to preference users, depletion of the account with PG&E is, in any event, inevitable. We do not think that the government will bear an intolerable burden if it is forced to repurchase banked power at an earlier date than was initially anticipated. Balancing the economic injury which Santa Clara has suffered by virtue of its partial exclusion from the CVP against the minimal inconvenience which the government will experience if the Secretary is forced to alter slightly his long-range marketing plan, we conclude that this action is not barred on grounds of sovereign immunity.

### VIII.

### THE NATIONAL ENVIRONMENTAL POLICY ACT

■ Santa Clara argued below and reiterates here that the Secretary violated NEPA, 42 U.S.C. § 4321 *et seq.,* by failing to file an environmental impact statement before denying the City's requests for firm power and initiating power withdrawals. NEPA, which requires agencies to file environmental impact statements whenever "major Federal actions" are contemplated, defines those actions as ones "significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). The trial

court concluded that the Secretary's marketing decisions were not major Federal actions of this kind and because no factual dispute was presented with respect to that key issue, granted the federal defendants' motion for summary judgment.

Seeking to bring the Secretary's allocation decisions within NEPA's definition of major Federal action, Santa Clara alleges that the government's refusal to sell it firm power will (1) force the City to construct its own generating facilities, and (2) cause industries to relocate to communities where electricity is available at lower cost. These effects, the City claims, will have a significant deleterious impact on the environment.

Because the amount of low cost CVP power is finite, demand will likely outstrip supply in the future as it has in the past. Regardless of whether it is Santa Clara or some other preference entity that is forced to look to private sources for the supply of electric power, the environmental consequences will be similar. If the demand for power exceeds the available supply, then new generating facilities must be constructed somewhere, if not in Santa Clara.

Even accepting as true Santa Clara's rather fanciful hypotheses concerning the likely impact of the Secretary's decisions on its small piece of the environment, we think it highly improbable that one allocation scheme will have a more deleterious impact than any other when the total geographic area served by the CVP is considered. As the court stated in *Hanly v. Kleindienst,* 2 Cir., 1972, 471 F.2d 823, 830, *cert. denied,* 1973, 412 U.S. 908, 93 S.Ct. 2290, 36 L.Ed.2d 974, an agency must consider "in deciding whether a major federal action will 'significantly' affect the quality of the human environment . . . the absolute quantitative adverse environmental effects of the action itself." No such absolute effects are threatened by the Secretary's decision to allocate CVP power in one way rather than another.

## CONCLUSION

The summary judgment against Santa Clara on its claim under the National Environmental Policy Act is affirmed.

The judgment dismissing the action is reversed.

The decision that the Secretary's actions in deciding the terms on which he will sell power to one preference customer as compared to others are reviewable is reversed.

The decision that the Secretary's sale of power to PG&E does not violate the preference clause is vacated.

The decision that the Secretary is required to formulate and adopt rules governing the sale of CVP power is reversed. The remand of the action to the Secretary for that purpose is reversed.

In all other respects, the decision of the trial court is affirmed.

The case is remanded to the trial court for further proceedings consistent with parts III B, V, and VI of this opinion.