GREENWOOD UTILITIES COMMISSION, Plaintiff,

v.

James R. SCHLESINGER et al., Defendants.

No. 77–179–MAC.

United States District Court, M. D. Georgia, Macon Division.

June 5, 1981.

Charles F. Wheatley, Jr., Wheatley & Wollesen, Washington, D. C., for plaintiff.

Ellen J. Sazzman, Dept. of Justice, Washington, D. C., Clinton A. Vince, C. Emerson Duncan, II, Duncan, Allen & Mitchell, Washington, D. C., L. Clifford Adams, Jr., Heard, Leverett & Adams, Atlanta, Ga., L. Clifford Adams, Jr., Heard, Leverett & Adams, Elberton, Ga., Reuben Goldberg, Goldberg, Fieldman & Letham, P. C., Washington, D. C., Charles R. Adams, Jr., Fort Valley, Ga., Paul T. Michael, Kilpatrick, Cody, Rogers, McClatchey & Regenstein, Washington, D. C., Robert B. Schwentker, Raleigh, N. C., S. Eason Balch, Jr., Robert A. Buettner, James H. Miller, III, Balch, Bingham, Baker, Hawthorne, Williams & Ward, Birmingham, Ala., Robert P. Gaines, Beggs & Lane, Pensacola, Fla., James S. Eaton, Eaton, Cottrell, Galloway & Lang, Gulfport, Miss., Bill M. Guthrie, Senior Vice President, Southern Company Services, Inc., Birmingham, Ala., Gene Nuss, Electric Cities of Georgia GMA, Atlanta, Ga., Robert B. Langstaff, Langstaff, Campbell & Plowden, Robert H. Forry, Troutman, Sanders, Lockerman & Ashmore, Atlanta, Ga., William T. Crisp, Crisp, Smith & David, Raleigh, N. C., Curtis H. Bell, Sol. Southeastern Power Administration, Elberton, Ga., Richard K. Pelz, Dept. of Energy, Office of the General Counsel, Washington, D. C., H. G. Baker, Jr., Senior Vice President,

Georgia Power Co., Atlanta, Ga., Denver L. Rampey, U. S. Atty., Macon, Ga., for defendants.

OWENS, Chief Judge:

This case is before the court on a motion for partial summary judgment. The plaintiff, Greenwood Utilities Commission, is a public agency of the City of Greenwood, Mississippi. It is engaged in the generation, transmission, and retail distribution of electric power and energy to its residents. The original defendants in this action were the Secretary of the United States Department of the Interior and the Administrator of the Southeastern Power Administration (SEPA). Subsequently, intervention was permitted pursuant to Rule 24(b) of the Federal Rules of Civil Procedure and the following were added as defendants: various power supply and power distribution cooperatives; the Water, Gas, and Light Commission of the City of Albany; the Georgia Power Company; the Georgia Municipal Association, Electric Cities of Georgia Section, and the Cities of Acworth, Georgia, et al.; and the Municipal Electric Authority of Georgia (MEAG). The motion before the court was filed by defendant MEAG and adopted by the other defendants. For convenience, the court will refer only to defendants MEAG and SEPA.

The case pertains to events occurring over more than a five-year period and involves multiple parties and issues. Despite the apparent complexity, the basic nature of this dispute can be succinctly stated as follows: SEPA is responsible for distributing electric power from certain electric generating projects operated by the United States Army Corps of Engineers. In carrying out this responsibility it has developed a marketing system in which it provides power within a certain geographic boundary. Plaintiff, located in northwest Mississippi, is outside of that boundary; nevertheless it wants SEPA to "wheel" power to it and claims that it is entitled to obtain this power. SEPA has refused and continues to refuse to sell any power to plaintiff.

Defendant MEAG filed its motion for partial summary judgment in this action pursuant to Rule 56 of the Federal Rules of Civil Procedure, claiming the existence of no genuine issue as to any material fact relating to the issues listed in the motion, and that as a matter of law defendant is entitled to a favorable judgment on each issue. These issues which MEAG claims are appropriate for summary disposition in favor of the defendants are: (1) Whether Section 5 of the Flood Control Act of 1944, 16 U.S.C.A. § 825s ("Section 5"), prohibits SEPA from allocating capacity and energy to numerous entities in a defined geographic marketing area which does not include Greenwood's geographic location; (2) Whether Section 5 of the Flood Control Act or the Due Process Clause of the Fifth Amendment to the United States Constitution prohibit SEPA from selling capacity and energy to certain preference entities unless SEPA also sells to Greenwood; (3) Whether SEPA was legally required by the Administrative Procedure Act to develop rules or regulations relating to the development of a federal power marketing plan; (4) Whether Due Process required SEPA to afford Greenwood more procedural process than was afforded to Greenwood; (5) Whether the record developed by SEPA in formulating its federal power marketing plan is inadequate, assuming that SEPA was required to develop such a record; and (6) Whether SEPA was required by Section 102 of the National Environmental Policy Act, 42 U.S.C.A. § 4332 (1977), to prepare an environmental impact statement in connection with its development of a federal power marketing plan.

## FACTS

There is no genuine dispute as to the following material facts. Plaintiff Greenwood Utilities Commission, City of Greenwood, Mississippi ("Greenwood") is located in northwest Mississippi and in FPC Power Supply Area 25.[1] Plaintiff is not and has

---

1. FPC Power Supply Areas were devised by the Federal Power Commission—now the Federal Energy Regulatory Commission—and reflect electric utility operating areas.

never been located in any of SEPA's marketing areas and has never received an allocation of power from SEPA.

Defendant SEPA is a federal power marketing agency. It neither owns nor controls any transmission lines and therefore is unable to move the output of the projects to its customers without obtaining the use of transmission lines owned by others. SEPA also lacks the capability to adequately "firm up" the output of its hydroelectric projects with thermal generating units.[2] Demand of potential customers for SEPA-marketed power far exceeds the supply.

During the mid-1970's, SEPA found it necessary to develop a federal power marketing plan for the disposition of the output of three new hydroelectric projects,[3] known as the Carters, Jones Bluff, and West Point projects, located in the States of Georgia and Alabama. These projects are a part of SEPA's "Georgia-Alabama System." This system is composed of six other hydroelectric projects in addition to these three. Because the output of the six other projects was already committed when the Carters, Jones Bluff, and West Point projects came on line in 1975–76, it was necessary to devise this separate plan for marketing the output of the three projects.

Operating in the general geographic region in which the projects are located are four operating companies of the Southern System.[4] The four companies operate as a single integrated generation and transmission system. Their transmission system is the only one covering the entire geographic marketing area adopted by SEPA for the output of the Carters, Jones Bluff, and West Point projects. In addition, they possess thermal generating units capable of firming-up the output of SEPA's three projects. All preference entities[5] located in the service areas of the four Southern Companies were interconnected with the Southern Companies' transmission network.

SEPA ultimately determined to market the output of the three projects in the Service areas of the Southern Companies, which generally comprise FPC Power Supply Areas 22 and 23.[6] After selecting this geographic marketing area, SEPA offered to sell power to every preference entity located in the defined area and connected to one of the four Southern Companies. There are approximately 125 preference entities located within the Southern Companies' service areas, all of which receive allocations from the three projects under SEPA's marketing plan.

On November 19, 1975, Mr. Charles Mathews, Manager of Greenwood, mailed a brief letter to SEPA expressing an interest in obtaining an allocation of power from SEPA. On that same date, Mr. Mathews mailed another letter to the Assistant Secretary of Energy and Minerals of the Department of the Interior, with a copy also sent to the Administrator of SEPA. This letter also expressed Greenwood's interest in receiving power from SEPA.

By letter dated December 18, 1975, SEPA's Chief of Division of Power Sales replied to Mr. Mathews stating that SEPA was unable to offer power to Greenwood.

The Department of Interior also responded to Mr. Mathews by letter dated January

---

2. The output of a hydroelectric project frequently fluctuates according to variances in available water supplies. "Firming-up" refers to a method whereby the effects of such fluctuation are offset, as when a hydro project is operated in conjunction with a thermal generating unit.

3. Although plaintiff, in its response to defendants' summary judgment motion, claimed that the scope of this litigation is not limited to these three projects, this position represents a serious departure from the position it has taken since the inception of this lawsuit and from statements made by its counsel to this court

(Transcript of Pre-Trial Conference at p. 16–17, Dec. 22, 1977).

4. These companies are the Georgia Power Co., Alabama Power Co., Mississippi Power Co., and Gulf Power Co.

5. These are public bodies and cooperatives to which SEPA is required to give "preference" in the sale of its power and energy by virtue of Section 5 of the Flood Control Act.

6. This includes all of Georgia and Alabama, "panhandle" Florida and southeastern Mississippi.

20, 1976. This letter explained that the output of the projects was to be marketed in FPC Power Supply Areas 22 and 23. The letter also advised Greenwood of factors considered by SEPA in reaching its decision to market the output of the three new projects in that geographic area.

On January 28, 1976, a meeting was conducted between representatives of SEPA and Greenwood to discuss in greater detail Greenwood's request for an allocation of power. In attendance at this meeting were the present and former Administrators of SEPA, SEPA's General Counsel, and the Chief of SEPA's Division of Power Sales. Greenwood was represented by its Chairman, Manager, and Assistant Manager.

At this meeting Greenwood was afforded an opportunity to offer information to SEPA and to question SEPA's representatives. SEPA explained the nature of its marketing plan, the fact that it had only peaking capacity with little energy, and that its power was already "spread very thin" among its existing customers.

After the meeting Greenwood mounted a campaign to exert Congressional pressure on SEPA. Correspondence and telephone inquiries transpired between Senators Eastland and Stennis of Mississippi and SEPA, in which Greenwood's interest in SEPA marketed power and SEPA's inability to meet this request were again aired. The former and present Administrators of SEPA then personally met with certain staff personnel from the offices of Senators Eastland and Stennis in two separate meetings. These meetings occurred in Washington, D. C. in March 1976.

SEPA re-examined its proposed marketing plan for its projects as a result of Greenwood's direct and indirect inquiries. The Administrator of SEPA noted, *inter alia*, that Greenwood's situation was not significantly different from other interested applicants which, like Greenwood, were located outside the geographic marketing area and concluded with a recommendation that the Department of Interior continue with the marketing plan as it had been developed.

Plaintiff subsequently filed an "appeal" of SEPA's decision with the Secretary of the Interior on October 8, 1976. By letter dated November 10, 1976, the Department of Interior acknowledged receipt of this "appeal," and informed counsel that the matter was under consideration. On January 18, 1977, the Deputy Assistant Secretary of the Interior issued a response to Greenwood's appeal, and reaffirmed its belief in SEPA's decision regarding the marketing of the output of the Carters, Jones Bluff, and West Point projects. Greenwood initiated the instant litigation shortly thereafter.

## ISSUES

Each of the issues raised by defendant MEAG will be considered separately and a determination made whether summary judgment is appropriate as to that issue.

I. WHETHER SEPA, PURSUANT TO SECTION 5 OF THE FLOOD CONTROL ACT, HAS UNREVIEWABLE DISCRETION TO SELECT A GEOGRAPHIC MARKETING AREA.

■ The relevant statute which SEPA operates under in marketing power is Section 5 of the Flood Control Act, 16 U.S.C.A. § 825s (1974) which states in pertinent part:

"Electric power and energy generated at reservoir projects under the control of the Department of the Army and in the opinion of the Secretary of the Army not required in the operation of such projects shall be delivered to the Secretary of the Interior, who shall transmit and dispose of such power and energy in such manner as to encourage the most widespread use thereof at the lowest possible rates to consumers consistent with sound business principles.... Preference in the sale of such power and energy shall be given to public bodies and cooperatives."

Plaintiff contends SEPA violated this section by excluding Greenwood from a federal power allocation because of its geographic location. Defendant MEAG agrees that plaintiff lies outside the geographic

marketing area set up for marketing the output of the three projects, but claims that SEPA has unreviewable discretion to designate the area in which it markets its power. For support of its contention defendant relies on *City of Santa Clara v. Andrus*, 572 F.2d 660 (9th Cir. 1978), *cert. denied*, 439 U.S. 859, 99 S.Ct. 176, 58 L.Ed.2d 167 (1978).

The City of Santa Clara sued the Secretary of Interior and Bureau of Reclamation (a federal power marketing agency comparable to SEPA) challenging the Secretary's decision to withdraw power from Santa Clara and to deny it an allocation of firm power. 572 F.2d at 663. The City's suit charged, *inter alia*, that the Secretary's decision to withdraw power was reviewable by the court and that the Secretary had abused its discretion in making the decision. The defendant claimed that the Secretary's marketing decisions were nonreviewable actions committed to agency discretion by law, within the meaning of the Administrative Procedure Act (APA), 5 U.S.C.A. § 701(a)(2) (1977). The court acknowledged that nonreviewability is a narrow exception, the existence of which must be clearly demonstrated, and that review is precluded only where statutes are drawn so broadly that in a given case "there is no law to apply." 572 F.2d at 666 quoting *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 410 (1971), 91 S.Ct. 814, 821, 28 L.Ed.2d 136, 150. It then found that there was no law to apply in the case before it and therefore the Secretary's decision to withdraw power was not reviewable by the court. It found the standard contained in Section 5 of the Flood

Control Act, 16 U.S.C.A. § 825s (1974), too vague and general to provide "law to apply." In the words of the court, "the provisions of this statute breathe discretion at every pore." 572 F.2d at 668 quoting *Strickland v. Morton*, 519 F.2d 467, 469 (9th Cir. 1975).

Defendant MEAG submits that the APA, 5 U.S.C.A. § 701(a)(2) which was applicable in *City of Santa Clara* also applies in the present case and leaves this court without jurisdiction to review SEPA's selection of a geographic marketing plan under Section 5. MEAG contends that Section 5 provides no standard by which the court may evaluate SEPA's selection of its geographic marketing area. Accordingly, such a decision is committed to SEPA's discretion by law and is not subject to review by this court.

Plaintiff, of course, argues that there is *no* non-reviewable discretion to select a geographic marketing area and that SEPA's actions were an arbitrary abuse of discretion given them by Section 5. According to plaintiff, SEPA's actions are reviewable by this court pursuant to the Administrative Procedure Act, 5 U.S.C.A. § 706 (1974).[7] As support plaintiff cites *Ortego v. Weinberger*, 516 F.2d 1005 (5th Cir. 1975). The relevant issue in *Ortego* was whether the court had jurisdiction to review the Secretary of Health, Education, and Welfare's refusal to reopen Ortego's application for disability benefits. In determining that the court *did* have jurisdiction to review the Secretary's decision, the Court of Appeals considered Sections 701 and 706 of the Administrative Procedures Act, 5 U.S.C.A.

---

7. To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—

(1) compel agency action unlawfully withheld or unreasonably delayed; and

(2) hold unlawful and set aside agency action, findings, and conclusions found to be—

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

(B) contrary to constitutional right, power, privilege, or immunity;

(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

(D) without observance of procedure required by law;

(E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

(F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

§§ 701(a)(1), (2) and 706 (1974). While acknowledging that § 701 places some limitations on the right of judicial review, the Court determined that when § 701 and § 706 are read together they suggest that the APA "envisions limited review by the judiciary to ensure that administrators do not abuse the discretion granted them by Congress." 516 F.2d at 1009.

This court cannot agree with defendant MEAG's assertion that it is without jurisdiction to review SEPA's selection of a geographic area because this agency's action was "committed to agency discretion by law." 5 U.S.C.A. § 701(a)(2). Even if Section 5 were found to be so vague as to "breathe discretion at every pore," this court would still have jurisdiction to review for *abuse of that discretion.* 516 F.2d at 1009. It must be determined whether the actions of the SEPA personnel in determining the geographic area in which to market power, based on the present set of facts, amounted to such an abuse of discretion. Under Section 5 of the Flood Control Act, SEPA does not have completely unfettered discretion to select a geographic marketing area. Consequently, the defendants' motion for summary judgment as to this issue is DENIED.

II. WHETHER THERE ARE ANY RESTRAINTS ON SEPA'S DISCRETION IN SELLING POWER TO PREFERENCE ENTITIES.

■ Plaintiff contends that when SEPA refused to provide it with low cost federal power while providing such service to other preference customers that it acted in violation of Section 5 of the Flood Control Act and the Equal Protection concepts embodied in the Fifth Amendment of the United States Constitution. Defendant MEAG counters that neither Section 5 nor the Fifth Amendment acts as a restraint on its discretion in choosing to which preference entities it will sell. Its argument that Section 5 does not prohibit this is the same as that offered above in reference to SEPA's establishing a geographic market, *i. e.,* that SEPA has unreviewable discretion to select eligible preference entities under Section 5.

It is not necessary to deal with the constitutional argument as to this issue. The same questions concerning discretion and judicial review exist here as in the issue discussed above. Again, this court is of the opinion that Section 5 of the Flood Control Act does not grant completely unfettered discretion; to be decided is whether the Secretary abused his discretion by denying power to Greenwood while approving power allocations to other preference customers, the Ninth Circuit's opinion in *City of Santa Clara* notwithstanding. As a result, defendant's motion for summary judgment on this issue is likewise DENIED.

III. WHETHER SEPA WAS REQUIRED BY THE APA TO MAKE OR PUBLISH RULES OR REGULATIONS RELATING TO THE DISPOSITION OF FEDERAL HYDROELECTRIC POWER.

■ Plaintiff claims that SEPA failed to meet the requirements of either § 552 or § 553 of the APA, 5 U.S.C.A. §§ 552 and 553 (1977). Section 552 (the publication requirement) states in pertinent part that:

"Each agency shall separately state and currently publish in the Federal Register for the guidance of the public—

\*    \*    \*    *.*    \*    \*

(B) Statements of the general course and method by which its functions are channeled and determined, including the nature and requirements of all formal and informal procedures available;

(C) Rules of procedure ... [and]

(D) Substantive rules of general applicability adopted as authorized by law, and statutes of general policy on interpretations of general applicability formulated and adopted by the agency ...."

Section 553 (the rule making requirement) states:

"(a) This section applies, according to the provisions thereof, except to the extent that there is involved—

(1) a military or foreign affairs function of the United States; or

(2) a matter relating to agency management or personnel or to public property, loans, grants, benefits, or contracts.

(b) General notice of proposed rule making shall be published in the Federal Register, unless persons subject thereto are named and either personally served or otherwise have actual notice thereof in accordance with law. The notice shall include—

(1) a statement of the time, place, and nature of public rule making proceedings;

(2) reference to the legal authority under which the rule is proposed; and

(3) either the terms or substance of the proposed rule or a description of the subjects and issues involved.

Except when notice of hearing is required by statute, this subsection does not apply—

(A) to interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice; or

(B) when the agency for good cause finds (and incorporates the finding and a brief statement of reasons therefor in the rules issued) that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest.

(c) After notice required by this section, the agency shall give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments with or without opportunity for oral presentation. After consideration of the relevant matter presented, the agency shall incorporate in the rules adopted a concise general statement of their basis and purpose. When rules are required by statute to be made on the record after opportunity for an agency hearing, sections 556 and 557 of this title apply instead of this subsection.

(d) The required publication or service of a substantive rule shall be made not less than 30 days before its effective date, except—

(1) a substantive rule which grants or recognizes an exemption or relieves a restriction;

(2) interpretative rules and statements of policy; or

(3) as otherwise provided by the agency for good cause found and published with the rule.

(e) Each agency shall give an interested person the right to petition for the issuance, amendment, or repeal of a rule."

Plaintiff does not believe SEPA is entitled to the "public property" exception to the rule-making requirement (§ 553(a)(2)) because, according to plaintiff, preference customers had a property interest in the power in question. Even if § 553 *is* inapplicable to SEPA, plaintiff argues that SEPA was required to meet the publication requirements of § 552. According to Greenwood, SEPA used specific criteria and procedures in making its decision and these constituted rules and regulations which should have been published.

Defendant MEAG argues that plaintiff's allegations as to both sections of the APA are contrary to established law. Congress has, since the initiation of the present suit, done away with the "public property" exception to the rule-making requirement of § 553. *See,* 42 U.S.C.A. § 7191(b)(3) (Pamph.1979). However, defendant points out that this elimination does not have retroactive effect. 42 U.S.C.A. § 7295(c)(1) and (2) (Pamph.1979). Therefore, at the time this suit was filed, a "public property" exception to § 553 did exist and SEPA was not required to make any rules regarding its disposition of power, since federal power from the projects is public property. As to § 552, MEAG argues that this publication requirement only applies to *existing* rules, and not promulgation of new rules. MEAG's position is that there were no rules existing to be published; therefore, the § 552 requirement is inapplicable.

The court is inclined to agree with defendant that power from federal hydroelectric projects is "public property," and thus exempt from the *rule-making* requirement

of § 553. However, even if SEPA did not have to make rules regarding its disposition of power from the Carters, Jones Bluff, and West Point projects—if it *did* make such rules which established some consistent criteria for SEPA's marketing of power from the projects—then these rules *would* have to be published in accordance with § 552. The purpose of § 552 is "to require agencies to make available to the public those policies and procedures which have become crystallized, which through experience have been formulated and adopted." Hearings before a subcommittee of the Senate Judiciary Committee on S.674, S.675 and S.918, 77th Cong., 1st Sess. 829 (1941), quoted in *City of Santa Clara, supra,* at 674. In the instant case there remains an issue as to whether the criteria used by SEPA to determine that plaintiff would not be given any power had become "crystallized," *i. e.,* were of such a nature as to be considered a "rule" or "regulation" within the meaning of § 552, requiring publication. For this reason, defendants' motion for summary judgment as to this issue is DENIED.

### IV. WHETHER PLAINTIFF WAS ENTITLED TO AND DEPRIVED OF DUE PROCESS OF LAW.

■ Defendant claims first that Greenwood had no property interest which would entitle it to due process, citing *City of Santa Clara,* 572 F.2d at 676. Because SEPA has, in defendants' opinion, unreviewable discretion to select preference entities, it contends that plaintiff could not reasonably assert that it had an objective belief that it would receive an allocation of power from SEPA based on a reading of Section 5 (Flood Control Act) in the abstract. Defendant also contends that, even as to *non*-preference entities, plaintiff had no property interest because it is located outside SEPA's geographic marketing area and has never received or been entitled to receive SEPA power.

Second, MEAG contends that, even assuming plaintiff had a property interest and therefore was entitled to due process protection as to both preference and non-preference entities, plaintiff was afforded that process which was due. MEAG asserts that the detailed correspondence by SEPA to Greenwood and its United States Senators explaining the basis of the marketing plan, and the meeting between SEPA and Greenwood representatives satisfied any due process rights plaintiff may have had.

Greenwood claims that by virtue of Section 5 of the Flood Control Act it *does* have a property interest in SEPA marketed power and that this interest is protected by the Due Process clause of the Fifth Amendment of the United States Constitution. It contends that the language of Section 5 that "[p]reference in the sale of such power shall be given to public bodies...." gives an *absolute preference* to preference customers. Because Section 5 does not read that public bodies and cooperatives shall be given power "as the Secretary directs," or some similar language, then Greenwood claims it had a full property interest in the power, which it could not be deprived of without being accorded its Fifth Amendment due process. Plaintiff also disagrees with MEAG's claim that assuming plaintiff was entitled to due process, this requirement was met. It claims entitlement to a hearing where it could support its allegations by argument and by proof; and it does not believe that its meeting with SEPA met this requirement.

The parties agree that *Mathews v. Eldridge,* 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976) applies in determining what due process protections are required. *Mathews* lists three factors that should generally be considered in identifying what process is due in a particular situation. First, the private interest that will be affected by the official action. Second, the risk of an erroneous deprivation of that interest through the procedures used and what value there may be to additional or substitute procedural safeguards. Third, the government's interest, including the fiscal and administrative burdens that additional or substitute procedural requirements would entail. Applying these factors to the circumstances before the court, it is evident that SEPA provided the fundamental requirement of due process, which is an op-

portunity to be heard "at a meaningful time and in a meaningful manner." *Armstrong v. Manzo*, 380 U.S. 545, 552, 85 S.Ct. 1187, 14 L.Ed.2d 62 (1965).

The court does not find it necessary to determine whether or not plaintiff had a property interest in SEPA power with respect to either preference or non-preference customers. Assuming that plaintiff had this property interest and was entitled to due process, plaintiff received all such process to which it was due. There was, as noted *supra*, correspondence between SEPA and both plaintiff and its United States Senators. An examination of MEAG Exhibits 1, 2, 7, 8, 10, 11, 12, 13, and "A" suggests a steady flow of communication. There was also a meeting between SEPA and plaintiff in which plaintiff had every opportunity to question SEPA personnel and "make its case." This meeting occurred in January, 1976, *before* SEPA signed contracts implementing its marketing plan.

Nor is the court persuaded that SEPA gave only cursory consideration to Greenwood's request. "Exhibit A"—Material Relating to the Pros and Cons of Marketing Power to Greenwood, Mississippi—was authored by the former Administrator of SEPA and provides an evaluation of Greenwood's request for power. It likewise predates the contracts implementing SEPA's power marketing plan for the three projects. The correspondence also shows that SEPA re-evaluated its decision as to Greenwood after meeting with some of the staff of Senators Eastland and Stennis. All of this suggests that plaintiff was accorded ample opportunity to present its side to SEPA. It is difficult to see what would be gained if more formal procedures were pursued, and whether the possible gain would justify the substantial burden that such procedures would place on SEPA, given the number of entities in addition to Greenwood to which SEPA would have to make the procedures available. Accordingly, defendant's motion as to this issue is hereby GRANTED.[8]

V. WHETHER SEPA WAS REQUIRED BY SECTION 102 OF THE NATIONAL ENVIRONMENTAL POLICY ACT TO PREPARE AN ENVIRONMENTAL IMPACT STATEMENT ON ITS DEVELOPMENT OF A POWER MARKETING PLAN.

▮ In its complaint plaintiff claims that SEPA's action in excluding Greenwood and the area in which it is located from consideration for federal power allocations was unlawful absent an environmental impact statement being submitted in accordance with Section 102 of the National Environmental Policy Act, 42 U.S.C.A. § 4332 (1977).[9]

MEAG contends that SEPA was not required to file an impact statement, citing as support *City of Santa Clara* at 679–680. In *City of Santa Clara* the plaintiff city claimed a violation of NEPA because of a government official's failure to file an impact statement before denying the plaintiff's request for firm power and initiating power withdrawals. The Court of Appeals disagreed, finding it "highly improbable that one allocation scheme will have a more deleterious impact than any other when the total geographic area served by the CVP (SEPA's counterpart in *City of Santa Clara*) is considered." 572 F.2d at 680.

Greenwood is not complaining, nor could it complain, that § 4332 was violated by

---

**8.** This does not, of course, answer the question of whether or not SEPA, having accorded plaintiff due process and gathered its information, then abused the discretion given it by Section 5 of the Flood Control Act in choosing to which preference entities it would sell power (see II, supra).

**9.** The Congress authorizes and directs that, to the fullest extent possible:

(1) the policies, regulations, and public laws of the United States shall be interpreted and administered in accordance with the policies set forth in this chapter, and (2) all agencies of the Federal Government shall—

\* \* \* \* \* \*

(C) include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on—(i) the environmental impact of the proposed action.

SEPA's failure to file an impact statement in connection with the construction of the projects. This was obviously a major federal action "significantly affecting the quality of the human environment," a fact which SEPA acknowledges. See PX 37 at 12. And although the projects were all authorized and placed under construction before the passage of NEPA, nevertheless impact statements were being prepared for each of the three projects by the United States Corps of Engineers. Plaintiff's complaint is that *refusal to grant power to it* and others in plaintiff's geographic area was a decision which should have been accompanied by an impact statement. This complaint is very similar to that of the plaintiff in *City of Santa Clara* and it warrants a similar resolution.

In a report introduced by Greenwood as an exhibit to a deposition SEPA observed that:

> "Only existing facilities owned by utilities other than the Federal Government will be used. Power sold by the Government will displace power generated or purchased and transmitted from other sources (predominantly fossil fuel). Consequently, any environmental impact, quantitatively or qualitatively, will not be in excess of that already occurring. To the extent available, Government power will delay the need for new generating resources." PX No. 37 at 12.

Plaintiff has offered nothing to suggest that there *will be* any substantial quantitative or qualitative increase [10] in any adverse conditions presumably existing at the time the decision *not to market* power to plaintiff was made. Nor has plaintiff offered anything showing *any* significant effect on natural resources. *See, Image of Greater San Antonio, Texas v. Brown*, 570 F.2d 517, 522 (5th Cir. 1978).

Plaintiff offers little more than conclusory statements that SEPA's actions "undoubtedly" were of a type "significantly affecting the quality of the human environment throughout the SEPA region . . . .,"

and promises to present evidence on this at trial. In light of evidence to the contrary offered by defendant (PX 37), plaintiff's response is not sufficient to create a genuine issue of material fact in defense to defendants' motion (F.R.Civ.P. 56(e)). Accordingly, as to this issue, defendants' motion for summary judgment is GRANTED.

### SUMMARY

As to whether plaintiff was afforded due process (IV) and as to whether SEPA was required to submit an environmental impact statement (V), the court finds no genuine issue as to any material fact and concludes that defendants are entitled to a judgment as a matter of law. Therefore, defendants' motion as to these two issues is GRANTED.

As to the remaining issues presented by defendants for summary disposition (I, II, and III) substantial controversy remains. Accordingly, defendants' motion as to these issues is hereby DENIED.

This court will, pursuant to Rule 56(d), set a date for further proceedings on the remaining issues in this case.

SO ORDERED.

---

**10.** See *Handley v. Kleindienst*, 471 F.2d 823, 830–831 (2nd Cir. 1972) cited in *City of Santa Clara, supra*, at 680.