**GREENWOOD UTILITIES COMMIS-SION, Plaintiff-Appellant,**

v.

**Donald P. HODEL, et al., Defendants-Appellees,**

**Municipal Electric Authority of Georgia, et al., Intervenors-Appellees.**

**GREENWOOD UTILITIES COMMIS-SION, Plaintiff-Appellant,**

v.

**Donald P. HODEL, et al., Defendants-Appellees.**

Nos. 84–8069, 84–8804.

United States Court of Appeals, Eleventh Circuit.

July 9, 1985.

Charles F. Wheatley, Jr., Don Charles Uthus, William Steven Paleos, Washington, D.C., for plaintiff-appellant.

Frank L. Butler, III, Asst. U.S. Atty., Macon, Ga., for federal defendants.

Robert Langstaff, Albany, Ga., for WG & LC, City of Albany.

Drake Cutini, Civ. Div., Robert S. Greenspan, Washington, D.C., for S.E. Power Admin. & Secy. of Energy.

Robert Forry, Robert P. Edwards, Jr., Atlanta, Ga., for Ga. Power Co.

Clinton A. Vince, Paul E. Nordstrom, Washington, D.C., for Mun. Elec. Authority of Ga.

Robert B. Schwentker, Raleigh, N.C., for Elec. Co-op.

Before RONEY and HENDERSON, Circuit Judges, and TUTTLE, Senior Circuit Judge.

RONEY, Circuit Judge:

█ This case involves the attempt to purchase power from the Southeastern Power Administration (SEPA), a division of the Department of Energy of the United States, by Greenwood Utilities Commission (Greenwood), an agency of the City of Greenwood, Mississippi, which supplies electricity to customers in that area. The factual background and legal arguments which underlie the action are set forth in a previous order of the district court granting a motion for partial summary judgment, *Greenwood Utilities Commission v. Schlesinger*, 515 F.Supp. 653 (M.D.Ga. 1981). Further background information is reported in a related case in which Greenwood failed in its attack through the antitrust laws on the refusal of SEPA to allocate electrical power to it. *Greenwood Utilities Commission v. Mississippi Power Co.*, 751 F.2d 1484 (5th Cir.1985). Greenwood here claims that under the applicable statutory provisions, it is entitled to an allocation of power from current allocations among preference customers, and an additional allocation of power to compensate it for the power that it should have been allocated in the past but was not. The district court entered summary judgment for the defendant. As to the claim for retroactive or compensatory power, the court held alternatively that *first*, it was in effect a claim for monetary damages for which sovereign immunity has not been waived, and *second*, separate and apart from immunity, equitable considerations would prevent relief that would cause a redistribution of previously committed power. As to the claim for an allocation of the preference power to SEPA for distribution, the court held that a present allocation to Greenwood in a new Cumberland System marketing plan rendered the claim moot. Appellants have failed to convince us that the district court should be reversed. As an additional legal ground for affirming the summary judgment, however, we hold, contrary to the decision of the district court, that SEPA's choices of a marketing area for distribution of the energy available to it for sale, and its allocations among preference customers, are judicially unreviewable because there is no law to apply to SEPA's decision in this context.

█ Even if there is a question as to whether sovereign immunity would bar injunctive relief requiring SEPA to sell power to Greenwood, instead of some other customers, that relief is equitable and the court's alternative decision that it would not grant such relief would not seem to be

reversible on appeal under an abuse of discretion standard of review. The court said:

"Separate and apart from sovereign immunity, alternative grounds exist for denying plaintiff's ability to seek a supplemental, retroactive allocation of power. Even if plaintiff's prayer could be categorized as being only injunctive in nature, this court would be required to weigh equitable considerations in assessing the propriety of such relief. The injunctive relief requested could not issue if the hardship thereby imposed upon the defendants would outweigh the benefits to be derived by the plaintiff. See, Weinberger v. Romero-Barcelo, [456] U.S. [305] [311–312, 102 S.Ct. 1798, 1802–03], 72 L.Ed.2d 91, 98–99 (1982). The public and social consequences, as well as the hardship which would be imposed on innocent third parties, must be considered. Id. [456 U.S. at 312, 102 S.Ct. at 1803, 72 L.Ed.2d] at 99; see, J. Moore, 7 Moore's Federal Practice, ¶ 65.18[3], at 65–136 to 65–140.1 (1980). Where the interests of the public as opposed simply to those of private litigants are at stake, a court may go much further in withholding injunctive relief. See, Standard & Poor's Corp. v. Commodity Exchange, 683 F.2d 704, 711 (2d Cir. 1982); D. Dobbs, Remedies, § 2.5 at 65 (1973). Plaintiff's request involves a finite, limited resource for which complex marketing plans and third party expectations have been established. Implementation of plaintiff's requested relief would necessarily involve a re-distribution of previously committed power. Numerous preference entities which have made future plans anticipating receipt of a given amount of SEPA power would lose a substantial portion thereof if plaintiff's request is granted. This in turn would require those preference entities to acquire power from substitute sources, and in all likelihood at higher prices. Rate schedules would then have to be re-evaluated, and the public consumer would bear the cost. Although plaintiff attempts to answer this concern by suggesting that its supplemental allocation could be completely derived from the accounts of the defendant Southern Company, even if this proposition were true Southern would then be required to re-allocate its limited resources and most likely the public served by Southern Company would bear the ultimate cost of plaintiff's increased allocation.

"Assuming plaintiff were to prevail on the merits of its § 5 claim, it could be argued that the Southern Company and the preference entities within its borders received power in the past at plaintiff's 'expense.' Nevertheless, in weighing the relative hardships which a corrective injunction would entail—not only to the defendants but to the public consumer as well—this court must find that equity compels the withholding of plaintiff's requested relief." (footnote omitted).

As to the mootness claim, again we simply quote the district court's reasoning which appears to foreclose reversal on appeal:

"Having determined that plaintiff would in no event be entitled to a retroactive, compensatory allocation of power, the court must decide whether plaintiff's claim for prospective relief has been rendered moot by SEPA's new Cumberland System marketing plan.

It is well settled that a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice. Such abandonment is an important factor bearing on the question whether a court should exercise its power to enjoin the defendant from renewing the practice, but that is a matter relating to the exercise rather than the existence of judicial power.

＊　＊　＊　＊　＊　＊

'The test for mootness in cases such as this is a stringent one. Mere voluntary cessation of allegedly illegal conduct does not moot a case; if it did, the courts would be compelled to leave "[t]he defendant ... free to return to his old ways." United States v. W.T. Grant Co., 345 U.S. 629, 632, 97 L.Ed. 1303, 73 S.Ct. 894 [897] (1953); see e.g., United States v. Trans-Missouri Freight Ass'n, 166 U.S. 290, 41 L.Ed. 1007, 17 S.Ct. 540

(1897). A case might become moot if subsequent events made it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur.... Of course it is still open to appellees to show, on remand, that the likelihood of further violations is sufficiently remote to make injunctive relief unnecessary. [345 U.S.] at 633–636, 97 L.Ed. 1303, 73 S.Ct. 894. This is a matter for the trial judge.'

*"City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289, 289 n. 10 [102 S.Ct. 1070, 1074 n. 10, 71 L.Ed.2d 152] (1982). In opposition to the suggestion of mootness, plaintiff first argues that even with its allocation from the new Cumberland plan SEPA would still be in violation of § 5 if it continues to sell 'capacity without energy' to non-preference entities such as the Southern Company in return for the latter's wheeling and firming services. This argument is based on plaintiff's construction of § 5 to the effect that a non-preference entity may receive no SEPA power whatsoever until *all* preference entities are first served. Thus, plaintiff argues, there is less SEPA power available for preference entities like itself when SEPA violates this rule by selling capacity without energy to the non-preference conduits. Second, the plaintiff argues that an injunction is necessary since SEPA has not yet allocated power to it, and could withdraw its proposal at anytime.

"With regard to plaintiff's first argument, the court must observe that plaintiff has overlooked a critical fact. SEPA has no transmission lines. In order for plaintiff and other preference entities to receive SEPA power the lines of non-preference, large power companies such as the Southern Company must be used for transmission. These private companies cannot be forced to transmit and wheel SEPA power without some form of compensation; to do so would almost certainly amount to an unconstitutional 'taking' without just compensation. These wheeling and banking services must be paid for by either SEPA or the individual preference buyers. SEPA has administratively decided to pay for these services through the sale of 'ca-

pacity without energy.' Were it not for this arrangement plaintiff would have to pay for it. Thus, if SEPA were ordered to discontinue this practice whatever excess power might be available would certainly be offset by the wheeling cost which plaintiff would incur.[2]

[2] This conclusion is not intended to be a ruling on the merits of plaintiff's § 5 claim. Were it not for SEPA's proposal to serve plaintiff, additional considerations would be necessary. In light of plaintiff's future allocation, its current claim, for the reasons stated above, does not preclude a finding of mootness.

"Finally, plaintiff's contention that SEPA's Cumberland System Plan, once implemented, could be terminated does not persuade this court that the controversy is not moot. Once implemented, SEPA's marketing policy and plan because of its complexity is unlikely to be altered. Long term contracts have been or will be entered into. Administrative procedures must be complied with before further marketing changes can be effected. This court is firmly convinced that any alleged unlawful conduct (*i.e.*, Greenwood's failure to receive any SEPA power) is highly unlikely to recur.

### *"Conclusion*

"Even if plaintiff Greenwood Utilities Commission should prevail on the merits, plaintiff would not be entitled to a compensatory, retroactive allocation of power. This decision rests upon the doctrine of sovereign immunity as well as the equitable considerations associated with injunctive relief.

"Plaintiff's claim for prospective relief has been rendered moot by SEPA's new Cumberland System marketing plan. This finding presupposes that plaintiff will indeed receive its appropriate allocation as soon as reasonably possible. This court will retain jurisdiction and postpone a dismissal on grounds of mootness pending the actual delivery of SEPA power to plaintiff. If plaintiff should obtain substantial evidence that SEPA is not progressing with all deliberate speed towards this end it may petition the court for reconsideration. The federal defendants shall continue submit-

ting status reports as directed by the court at the June 1, 1983 conference."

In any event, at the bottom of all the claims and arguments made by the plaintiff in this lawsuit is the concept that the decisions of SEPA as to the allocation of power to purchasers are reviewable in a court of law. The district court held that such decisions are reviewable under an abuse of discretion standard. *Greenwood Utilities,* 515 F.Supp. at 659. A careful study of the statute convinces us to the contrary.

██ The Administrative Procedure Act (APA) provides that judicial review of an administrative decision is precluded where "agency action is committed to agency discretion by law." 5 U.S.C.A. § 701(a)(2). Judicial review, however, is the rule and nonreviewability is a narrow exception which must be clearly demonstrated. *City of Santa Clara v. Andrus,* 572 F.2d 660, 666 (9th Cir.), *cert. denied,* 439 U.S. 859, 99 S.Ct. 177, 58 L.Ed.2d 167 (1978). Only "in those rare instances where 'statutes are drawn in such broad terms that in a given case there is no law to apply'" is judicial review precluded. *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 410, 91 S.Ct. 814, 821, 28 L.Ed.2d 136 (1971) (quoting S.Rep. No. 752, 79th Cong., 1st Sess. 26 (1945)). Yet if a statute confers such uninhibited discretion upon an administrator that courts have "no standard against which to measure the lawfulness of agency action," then no issues capable of "judicial resolution are presented and the courts are accordingly without jurisdiction." *City of Santa Clara,* 572 F.2d at 666; *see also Morris v. Gressette,* 432 U.S. 491, 500–01, 97 S.Ct. 2411, 2418–19, 53 L.Ed.2d 506 (1977). Only if a specific statute somehow limits the agency's discretion to act is there sufficient "law to apply" as to allow judicial review. *City of Santa Clara,* 572 F.2d at 666.

██ The law is clear that certain agency actions can be committed to agency discretion by law under 5 U.S.C.A. § 701(a)(2) and are not reviewable even for an abuse of discretion. As the Supreme Court stated in *Heckler v. Chaney,* —— U.S. ——, ——, 105 S.Ct. 1649, 1655, 84 L.Ed.2d 714,

723 (1985), "if no judicially manageable standards are available for judging how and when an agency should exercise its discretion then it is impossible to evaluate agency action for 'abuse of discretion.'" *See also American Federation of Government Employees, Local 2017 v. Brown,* 680 F.2d 722, 726–27 (11th Cir.1982), *cert. denied,* 459 U.S. 1104, 103 S.Ct. 728, 74 L.Ed.2d 952 (1983).

Such is the case here. The United States Army Corps of Engineers constructs flood control dams to enhance the nation's ecology and to serve the varied purposes of soil preservation, enhanced water supply, improved navigation, flood control, and recreation. Where hydrological and environmental conditions permit, area power supply needs create a demand, and anticipated revenues appear to justify the cost, the government will design and construct flood control projects which also produce electricity. Congress then gave directions to the Department of the Interior concerning its disposition of electricity in excess of the Army's needs in the Flood Control Act of 1944. This was not a public aid program for municipal power systems. *See United States v. Tex-La Electric Cooperative, Inc.,* 693 F.2d 392, 393–94 (5th Cir.1982).

The Flood Control Act merely establishes a series of general directives to control the distribution of excess electricity. It does not establish an entitlement to power. Section 5 of the Flood Control Act of 1944, 16 U.S.C.A. § 825s, neither establishes standards for eligibility for applicants for a government benefit as the statute did in *Goldberg v. Kelly,* 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970), nor purports to enumerate the conditions pursuant to which a government benefit may be denied, as was the case in *Arnett v. Kennedy,* 416 U.S. 134, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974).

Section 5 provides that the Secretary of Energy is to transmit and dispose of power under its control "in such manner as to encourage the most widespread use thereof" and that "[p]reference in the sale of such power and energy shall be given to

public bodies and corporations." There is no law to apply regarding the Secretary's decision to market power among preference customers. Under section 5's "most widespread use" directive, some entities could get more power than others if, for instance, the Secretary determined they could most efficiently use it. Other preference entities could be shut out completely, yet there would be nothing for this Court to do because there are no legal standards for guidance. As stated by the Ninth Circuit when reviewing this same provision, " '[t]he provisions of this statute breathe discretion at every pore' ... [it] permits the exercise of the widest administrative discretion by the Secretary. It does not supply 'law to apply.' " *City of Santa Clara*, 572 F.2d at 668 (quoting *Strickland v. Morton*, 519 F.2d 467, 469 (9th Cir.1975)) (citations omitted).

 Although plaintiff asserts that defendants cannot argue nonreviewability on this appeal because they did not file a notice of cross-appeal, there is no merit in that argument here. This court may affirm the district court for any decision that is supported by law, without the need of a cross-appeal. *See, e.g., Fortson v. St. Paul Fire & Marine Insurance Co.*, 751 F.2d 1157, 1158 (11th Cir.1985); *Stockton v. Lucas*, 482 F.2d 979, 985 (Em.App.1973).

Plaintiff's final two arguments regard an alleged denial of due process in its denial of SEPA power, and the alleged unlawful failure of SEPA to develop an Environmental Impact Statement (EIS) regarding its power marketing plan. We find merit in neither argument.

Plaintiff's basic argument that SEPA paid too little attention to its requests for power is not supported by the record. There was a steady flow of communication between SEPA and Greenwood and Greenwood's senatorial representatives. The various documents submitted to Greenwood from SEPA fully explained the marketing plan and the reasons for it. Meetings were held where Greenwood was given, it appears, every opportunity to present its request for preference power.

 More to the point, plaintiff never had a property interest in the subject power that would entitle it to due process. Even preference entities have no entitlement to federal hydroelectric power. *Arizona Power Pooling Ass'n v. Morton*, 527 F.2d 721, 730 (9th Cir.1975), *cert. denied*, 425 U.S. 911, 96 S.Ct. 1506, 47 L.Ed.2d 761 (1976). They simply have a "preference," and a "preference" is insufficient to create a due process property interest. *Cf. Board of Regents v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972).

 No EIS was required because nothing in the record suggests SEPA's power marketing scheme would in any way constitute a major federal action "significantly affecting the quality of the human environment," the standard of the National Environmental Policy Act (NEPA), 42 U.S.C.A. § 4332(2)(C). Certainly the construction of the various SEPA hydroelectric projects themselves required an EIS, and presumably NEPA's requirements were then met. But in terms of SEPA's power marketing scheme here, there is simply no evidence of any significant impact.

A similar NEPA issue was present in *City of Santa Clara*. There the court stated that even if Santa Clara's contentions concerning the environmental effect of a power marketing scheme were true,

we think it highly improbable that one allocation scheme will have a more deleterious impact than any other when the total geographic area served by the [federal hydroelectric project] is considered.

572 F.2d at 680.

The summary judgment for defendants is

AFFIRMED.